**SIMON WRECKING COMPANY, INC., and Simon Resources, Inc., and Mid-State Trading Company, Plaintiffs,**

v.

**AIU INSURANCE COMPANY, et al., Defendants.**

No. Civ.A. 03–CV–3231.

United States District Court, E.D. Pennsylvania.

Dec. 29, 2004.

John N. Ellison, Shruti D. Engstrom, Anderson, Kill & Olick PC, Philadelphia, PA, for Plaintiffs.

John J. Hatzell, Jr., Law Offices of John R. McHaffie, Lawrence P. Engrissei, Law Offices of Lawrence P. Engrissei, Ronald P. Schiller, Piper Rudnick LLP, John C. Sullivan, Post and Schell, P.C., Philadelphia, PA, M. Elizabeth Medaglia, Richard S. Kuhl, Paul D. Smolinsky, Jackson and Campbell, Washington, DC, Jay I. Morstein, Piper & Marbury, LLP, Baltimore, MD, for Defendants.

## *MEMORANDUM AND ORDER*

ANITA B. BRODY, District Judge.

### I. INTRODUCTION

Plaintiffs Simon Wrecking Company, Inc., Simon Resources, Inc., and Mid–State Trading Company (collectively referred to as "Simon") bring this suit against their insurers, defendants CNA Insurance Companies ("CNA"),[1] Transportation Insurance Company ("Transportation"), Continental Casualty Company ("Continental"), Liberty Mutual Insurance Company ("Liberty Mutual"), and AIU Insurance Company ("AIU") (collectively referred to as "insurance company defendants"). Simon brings three counts against defendants: (1) breach of contract, (2) declaratory judgment, and (3) bad faith under 42 Pa. C.S. § 8371. (Am.Compl.¶¶ 131–157.)

Currently before me are four summary judgment motions: (1) Liberty Mutual moves for summary judgment on all counts on the basis that they are barred by the statutes of limitations; (2) AIU moves for summary judgment on all counts on the basis that they are barred by the statutes of limitations; (3) CNA moves for summary judgment on the bad faith count on the basis that it is barred by the statute of limitations; and (4) Simon moves for summary judgment on their count of declarato-

---

1. Defendant CNA is an unincorporated association of insurance companies which includes defendants Transportation and Continental. When referring to defendants Continental and Transportation collectively, I will refer to them as "CNA."

ry relief on insurance company defendants' duty to defend.

 Jurisdiction is appropriate pursuant to 28 U.S.C. § 1332. When a federal district court exercises diversity jurisdiction, it must apply the substantive law as decided by the highest court of the state whose law governs the action. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). It is undisputed that Pennsylvania law governs the present action.

## II. BACKGROUND

### A. The Insurance Policies

From approximately October 1, 1974 to November 13, 1979, Simon was insured under certain primary, excess and/or umbrella comprehensive general liability ("CGL") insurance policies sold by CNA.[2] (Am.Compl.¶ 27.) From approximately November 13, 1979 to December 31, 1983, Simon was insured under CGL policies sold by Liberty Mutual. (*Id.* ¶ 28.) From approximately December 31, 1983 to December 31, 1985, Simon was insured under CGL policies sold by AIU. (*Id.* ¶ 29.) For purposes of the instant motions for summary judgment, the material clauses of these insurance policies are those controlling defendants' duty to defend and indemnify Simon and the pollution exclusion clauses.

The CGL policies sold by CNA, Liberty Mutual and AIU contain nearly identical language describing the insurer's duty to defend and indemnify the insured:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury or ... property damage to which this policy[3] applies, caused by an occurrence, and the company shall have the right and *duty to defend any suit* against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any *claim or suit* as it deems expedient....

(Def. Liberty Mutual's Mot. for Summ. J. Ex. P at LM Simon0000676; Pl.'s Resp. to Def.'s Mot. for Summ. J./Cross–Mot. for Summ. J. Ex. R at AIU000300, Ex. S at SMW00231 (emphasis added).)

The CGL policies sold by CNA, Liberty Mutual and AIU also contain nearly identical pollution exclusion clauses:

This policy[4] does not apply ... (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental* ....

(*Id.* (emphasis added).)

### B. Chronology

In November 1996, Simon received a Potentially Responsible Party Letter

---

**2.** Continental only sold umbrella coverage to Simon. (Pl.'s Resp. to Def.'s Mot. for Summ. J./Cross–Mot. for Summ. J. at 2.)

**3.** The only difference in language between this clause in Liberty Mutual's policy and the equivalent clauses in CNA's and AIU's policies is that Liberty Mutual uses the word "policy" here whereas CNA and AIU use the word "insurance." (Def. Liberty Mutual's Mot. for Summ. J. Ex. P at LM Simon0000676; Pl.'s Resp. to Def.'s Mot. for Summ. J./Cross–Mot. for Summ. J. Ex. R at AIU000300, Ex. S at SMW00231.)

**4.** See *supra* note 3.

("PRP letter") from the United States Environmental Protection Agency ("EPA"). (Stipulation ¶ 1.) The PRP letter notified Simon that it "may incur, or may have incurred, liability" under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9607(a), in connection with the Malvern TCE Superfund Site. (Stipulation Ex. D at SMW01272.) The Malvern Site, located in East Whiteland Township, Pennsylvania, was owned and operated by Chemclene Chemicals ("Chemclene"). (*Id.* at SMW01279.) Chemclene distilled and recycled used industrial cleaning solvents, including trichloroethylene (TCE), at the Malvern Site. (*Id.*) Drums containing residual sludge from the solvent recovery process were buried at the Malvern Site. (*Id.* at SMW01279, 1236.) Groundwater contamination associated with the Malvern Site was first identified in 1980 in residential wells. (*Id.* at SMW01279.) The Malvern Site was also associated with soil contamination. (*Id.*) The materials attached to the PRP letter included records indicating that Chemclene removed drums of used industrial cleaning solvents for Simon. (*Id.* at SMW01343–81.) The PRP letter to Simon stated: "By this letter, EPA notifies you of your potential liability with regard to this matter and encourages you to perform or to finance voluntarily those response activities that EPA determines to be necessary at the Site." (*Id.* at SMW01273.)

By letters dated February 12, 1997, Simon notified defendants AIU, Liberty Mutual, and CNA of Simon's receipt of the PRP letter and Simon's potential liability at the Malvern Site. (Stipulation ¶¶ 1–3.) Each of the February 12, 1997 notification letters stated that it served "as formal notice of receipt" of the PRP letter and "a request for defense and coverage for claims arising from this letter." (Stipula-

tion Ex. A at SMW01113, Ex. B at SMW01158, Ex. C at SMW01137.)

By letter dated October 14, 1997, AIU notified Simon that "coverage is denied based upon the pollution exclusions." (*Id.* Ex. E at SMW01083.) AIU based its denial on a review of the information provided by Simon and concluded, "The contamination at the Site is due to the continuous, long-term activities of the insured and others. Accordingly, AIU relies on provision (f) [the pollution exclusion] of the above exclusion to deny coverage for this claim." (*Id.* at SMW01083, 1086.)

By letter dated October 17, 1997, Liberty Mutual denied coverage to Simon for both defense and indemnity. (Stipulation ¶ 6.) Liberty Mutual's denial letter stated:

> The pollution exclusion precludes coverage for "property damage" arising from the discharge of pollutants that is not sudden and accidental. Our investigation reveals contamination resulted from day to day operations at this site that occurred gradually over time and was not the result [of] any "sudden and accidental" event. Consequently, Liberty Mutual will not reimburse Simon Wrecking or Simon Resources either with respect to any payment made in settlement of the above claim or in satisfaction of any judgment, or with respect to any defense costs Simon incurs in connection with this claim.

(Stipulation Ex. F at SMW01151.) Liberty Mutual's denial letter also stated:

> In addition to the foregoing basis [the pollution exclusion] for denial, we also take this opportunity to alert you to additional policy terms ... which would operate to limit or bar coverage.... No suit has been served on Simon Wrecking or Simon Resources, there-

fore, Liberty Mutual would not have any duty to defend.

(*Id.*)

In 1999, certain recipients of the Malvern Site PRP letter entered into a consent decree with the EPA and the Pennsylvania Department of Environmental Protection. (Stipulation ¶ 7.) Under this consent decree, the settling, potentially-responsible parties were permitted to file suit against the non-settling, potentially-responsible parties, which included Simon. (*Id.*)

By letter dated December 20, 2000, CNA reserved their rights and failed to defend or indemnify Simon. (Stipulation ¶ 8.) CNA's letter "request[ed] an update regarding developments ... since our last communication." (*Id.* Ex. H at SMW01128.) The letter requested more information from Simon, notified Simon of "potential bases" for the denial of coverage (including the pollution exclusion clauses), and asked for Simon's cooperation "in providing the information necessary to CNA's analysis of this claim." (*Id.* at SMW01129.)

By letters dated July 30, 2002, Simon notified defendants AIU, Liberty Mutual, and CNA that the settling potentially responsible parties from the Malvern Site had initiated a lawsuit against Simon, though the complaint had not yet been formally filed. (Stipulation Exs. J, K, L.) In these letters, Simon requested that the insurance companies defend Simon in the underlying lawsuit and reimburse Simon for the legal costs incurred since 1998. (*Id.*) Simon also requested that defendants' "reservations or coverage decisions be reexamined" in light of the Pennsylvania Supreme Court's decision in *Sunbeam Corp. v. Liberty Mutual Ins. Co.*, 566 Pa. 494, 781 A.2d 1189 (2001). (*Id.* at SMW01072, 1145, 1125.)

On December 9, 2002, the settling, potentially-responsible parties from the Malvern Site formally filed a complaint in this court against the non-settling, potentially-responsible parties from the Malvern Site. *Action Mfg. Co. v. Simon Wrecking Co.*, No. 02–8964 (E.D.Pa. filed Dec. 2, 2002) (hereinafter referred to as the *"Action Mfg.* suit"). (Stipulation Ex. I.) Simon is a named defendant in this suit, which is currently pending. Plaintiffs in the *Action Mfg.* suit are suing defendants for their share of "past and future response costs incurred in the environmental cleanup at the Malvern TCE Superfund Site." (*Id.* at SMW01166.)

By letter dated February 24, 2003, CNA responded to Simon's July 30, 2002 letter requesting "further information before the request for reimbursement to TIC [Transportation Insurance Company] can be meaningfully considered." (Stipulation Ex. N at SMW01120.)

By letter dated March 14, 2003, Liberty Mutual responded to Simon's July 30, 2002 letter. (Stipulation Ex. O.) Liberty Mutual stated that it had denied coverage for this claim in 1997, and therefore a suit by Simon would be barred by the statute of limitations. (*Id.* at SMW01141.)

Defendant AIU did not respond to Simon's July 30, 2002 letter.

On May 21, 2003, Simon filed the instant action for declaratory judgment, breach of contract and bad faith against defendants. (Stipulation ¶ 17.)

## III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), "[s]ummary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be re-

solved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir.1997).

## IV. DISCUSSION

### A. Statute of Limitations for Simon's Bad Faith Claim

■ Defendants AIU, Liberty Mutual, and CNA move for summary judgment on Simon's bad faith count on the basis that it is barred by the statute of limitations. Simon brings its bad faith claim under 42 Pa.C.S.A. § 8371. While the statute itself does not provide for a definition of bad faith, the standard definition developed in Pennsylvania case law provides: " 'Bad Faith' on the part of insurer is any frivolous or unfounded *refusal to pay proceeds of policy ....*" *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1036 (Pa.Super.1999) (emphasis added); *see also Terletsky v. Prudential Property & Casualty Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994). The statute also does not provide for a statute of limitations, nor has the Pennsylvania Supreme Court ruled on a statute of limitations for a statutory bad faith claim. However, the Third Circuit predicted that the "Supreme Court of Pennsylvania would hold that an action under section 8371 sounds in tort and thus is subject to a two-year statute of limitations under 42 Pa.Cons.Stat. § 5224(7)." *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 236 (3d Cir.2003).

The instant motions for summary judgment on Simon's bad faith claims turn on when the two-year statute of limitations started running. AIU, Liberty Mutual and CNA argue that the statute of limitations for bad faith started running when each of them responded to Simon's Febru-

ary 12, 1997 request for proceedings arising from the EPA PRP letter. (Mem. of Law in Supp. of Def. Liberty Mutual's Mot. for Summ. J. at 16–17; Joinder of Def. AIU to Def. Liberty Mutual's Mot. for Summ. J. at 1; Def. CNA's Mot. Partial Summ. J. at 7–12.) Simon argues that defendants' responses, or lack thereof, to Simon's July 30, 2002 request for coverage constituted new and distinct acts of bad faith, triggering the start of a new period of limitations in which Simon could bring suit. (Pl's Resp. to Def.'s Mot. for Summ. J./Cross–Mot. for Summ. J. at 17–35.) Defendant's reply that any response, or lack thereof, to Simon's July 2002 letter were continuing refusals and do not constitute acts of bad faith separate and distinct from their initial declination letters. (Def. AIU's Reply at 11; Def. CNA's Reply at 5; Def. Liberty Mutual's Reply at 4–13.)

The Pennsylvania Superior Court[5] in *Adamski* examined the question of when bad faith claims arose for the purposes of the statute of limitations. 738 A.2d 1033 (cited with approval by *Lang v. Continental Assurance Co.*, 54 Fed.Appx. 72, 2002 WL 31716447 (3d Cir.2002) (non-precedential opinion)). *Adamski* involved an accident between a car and a motorcycle in which the driver of the car was the friend of the car owner's daughter. The owner's insurance company refused to provide any liability protection for the driver on the basis that he was not a permissive driver. The driver later assigned his rights to the plaintiff who brought a claim for bad faith against the defendant insurance company. *Id.* at 1034. The plaintiff argued that the defendant insurance company committed separate and distinct acts of bad faith when it initially denied liability protection,

---

**5.** Although the Pennsylvania Supreme Court has not yet directly addressed the same issue that the Pennsylvania Superior Court ad-

dressed, I predict that the state's highest court will follow the same reasoning as the appellate court.

when it failed to provide a defense in the underlying lawsuit, and when it failed to indemnify once the full extent of litigation damages was known. *Id.* at 1035, 1041–42.

■ The *Adamski* court refused to "separate initial and continuing refusals to provide coverage into distinct acts of bad faith." *Id.* at 1042. For purposes of a bad faith claim, "one must look to the date on which the defendant insurance company first denied the insured's claim in bad faith." *Id.* at 1040 (internal citation and quotations omitted). The insurance company's initial denial of liability protection clearly stated that the insurance company would not take any action with respect to any claim or suit against the driver arising from the accident. *Id.* at 1038. All of the conduct underlying plaintiff's allegations of bad faith was apparent when the insurance company made its position clear, and the plaintiff (or the driver) could have commenced a bad faith action against the insurance company at any point after that time. *Id.* at 1039. The statute of limitations started running as soon as the right to institute suit arose. *Id.* at 1042. Because the initial denial "clearly put [the driver] on notice that he would not be covered, defended or indemnified in existing or future actions under the policy," the statute of limitations started running at the point of the initial denial and plaintiff could not avoid any applicable statute of limitations under Section 8371 by asserting

that continuing refusals to cover the driver were separate acts of bad faith. *Id.* at 1043.

■ In the instant case, *Adamski* requires that I determine when Simon was first put on notice that insurance company defendants were denying coverage and how expansive that denial was. CNA's letter of December 20, 2000 was not a denial of coverage.[6] Rather, it was a reservation of rights letter and a request for more information from Simon. (Stipulation Ex. H.) Under *Adamski*, the statute of limitations started running at the point of initial denial. 738 A.2d at 1040. Also, the Third Circuit held that "the essence of a bad faith claim must be the unreasonable and intentional (or reckless) denial of benefits" and there is no bad faith under 42 Pa.C.S. § 8371 without a denial of benefits. *UPMC Health System v. Metropolitan Life Ins. Co.*, 391 F.3d 497, 505 (3d Cir. 2004). CNA's argument that the statute of limitations bars Simon's bad faith claim fails because CNA's letter of December 20, 2000 did not actually deny coverage to Simon. Without a denial of benefits, there was no act of bad faith at the time of the December 20, 2000 letter and the statute of limitations for Simon's bad faith claim against CNA could not have started to run at that time. Therefore, CNA's motion for summary judgment as to Simon's bad faith claim is denied.[7] The remaining discus-

---

6. CNA's letter "request[ed] an update regarding developments ... since our last communication," notified Simon of "potential bases" for the denial of coverage (including the pollution exclusion clauses), and asked for Simon's cooperation "in providing the information necessary to CNA's analysis of this claim." (*Id.* at SMW01128–29.)

7. Because the Third Circuit has held that a bad faith claim must allege an actual denial of benefits, it is questionable whether Simon can bring a bad faith claim against CNA until CNA has actually denied coverage. In theory,

at some point, the failure of the insurer to complete a claim investigation and/or provide coverage puts the insured on notice that the insurer has denied coverage. However, because the merits of Simon's bad faith claim are not currently before me, I cannot decide whether Simon fails to allege denial of benefits, an element of a bad faith claim under Third Circuit law. *UPMC Health System*, 2004 WL 2903683 *6–7, 2004 U.S.App. LEXIS 26123 *21–22. Nor can I decide at what point a failure to provide coverage might constitute a denial of coverage because that

sion of bad faith involves defendants AIU and Liberty Mutual.

█ AIU's letter of October 14, 1997 denied coverage on the basis of AIU's analysis of the type of pollution at the Malvern Site and the pollution exclusion clause contained in the CGL policy. AIU stated, "The contamination at the Site is due to the continuous, long-term activities of the insured and others. Accordingly, AIU relies on provision (f) [the pollution exclusion] of the above exclusion to deny coverage for this claim...." (Stipulation Ex. E at SMW01086.) This denial letter by AIU was expansive enough to put Simon on notice that AIU would not cover any claim that arose out of the contamination at the Malvern Site. Therefore, the statute of limitations for Simon's bad faith claim against AIU started running at the time of this initial denial.

Like AIU's denial, Liberty Mutual's denial of October 17, 1997 was based on the application of its pollution exclusion clause to the type of pollution that took place at the Malvern Site. Liberty Mutual concluded that the contamination at the Malvern Site took place gradually over time and was not "sudden or accidental." (Stipulation Ex. F at SMW01151.) Therefore, Liberty Mutual would not reimburse Simon for any payments or defense costs made or incurred in connection with the claim. (Id.) Liberty Mutual's initial denial letter put Simon on notice that it would not cover any claim that arose out of the contamination at the Malvern Site, and,

therefore, also triggered the statute of limitations for purposes of Simon's bad faith claim against Liberty Mutual.

Simon argues that the insurance company defendants committed at least two additional separate and distinct acts of bad faith subsequent to their initial denials of coverage at the time Simon notified them of the EPA PRP letter. First, Simon argues that defendants acted in bad faith when they failed to provide coverage for the *Action Mfg.* suit filed in December 2002. However, AIU's and Liberty Mutual's initial denial letters both based denial of coverage on their analysis of the type of pollution at the Malvern Site and the applicability of the pollution exclusion clauses rather than merely denying a defense for the PRP letter or denying coverage on a more limited basis.[8] AIU's and Liberty Mutual's denials on the basis of the pollution exclusion clause put Simon on notice that they would not cover any claims arising from the contamination at the Malvern Site.[9] AIU and Liberty Mutual were not simply denying coverage for the EPA PRP letter. Therefore, AIU's and Liberty Mutual's denials of coverage for the *Action Mfg.* suit were continuing denials and not separate acts of bad faith.

█ Second, Simon argues that AIU and Liberty Mutual committed another act of bad faith when they failed to reconsider their coverage position in light of the Pennsylvania Supreme Court's decision in *Sunbeam Corp. v. Liberty Mutual Ins. Co.*, 566 Pa. 494, 781 A.2d 1189 (2001).[10]

would require findings of facts, *e.g.*, how long a claims investigation should take, which are not before me.

8. Defendant CNA's denial letters are not analyzed here because CNA's motion for summary judgment on the bad faith count is denied for other reasons.

9. Although Liberty Mutual's October 17, 1997 denial letter also states other bases for denial

of coverage, its denial on the basis of the pollution exclusion clause was broad enough to put Simon on notice that it would not cover any contamination that occurred gradually over time, no matter who brought the suit. (Stipulation Ex. F at SMW01151.)

10. The *Sunbeam* court held that the meaning of the pollution exclusion clause in CGL policies should be interpreted in light of the cus-

In Pennsylvania, intervening changes in law do not revive actions that have already been barred by the running of the statute of limitations. *See McHugh v. Litvin, Blumberg, Matusow & Young*, 525 Pa. 1, 574 A.2d 1040, 1044 (1990) (holding that "when courts overrule prior impediments to bringing suits they are not creating new causes of actions;" such changes in law should be applied only to cases "where the statute of limitations had not yet expired."); *Urland v. Merrell–Dow Pharmaceuticals, Inc.*, 822 F.2d 1268, 1276 (3d Cir.1987) ("Under Pennsylvania law, after an action had become barred by an existing statute of limitations, no subsequent legislation will remove the bar or revive the action.") (internal citations omitted). The statute of limitations for Simon's bad faith claims against AIU and Liberty Mutual for their refusal to provide coverage started to run at the time of their initial denial letters in October 1997. The two-year statute of limitations for these claims would have run in October 1999, long before the Pennsylvania Supreme Court decided *Sunbeam* in 2001. Therefore, *Sunbeam* could not have revived Simon's bad faith claim against AIU and Liberty Mutual and Simon's bad faith claims are barred by the statute of limitations.

In conclusion, AIU's and Liberty Mutual's motions for summary judgment as to Simon's bad faith claim are granted. CNA's motion for summary judgment as to Simon's bad faith claim is denied.

### B. Statute of Limitations for Simon's Breach of Contract Claim

■■■ Defendants AIU and Liberty Mutual [11] move for summary judgment on Simon's breach of contract claim. They argue it is barred by the four-year statute of limitations applicable to breach of contract claims under 42 Pa.C.S. § 5525(8) ("[T]he following actions and proceedings must be commenced within four years: ... (8) An action upon a contract, obligation or liability founded upon a writing...."). In general, "the statute of limitations [for a breach of contract] begins to run at the time when a complete cause or right of action accrues or arises ... or *when there is a demand capable of present enforcement.*" *Centre Concrete Company v. AGI, Inc.*, 522 Pa. 27, 559 A.2d 516, 518–19 (1989) (internal citations and quotations omitted) (emphasis added). Under Pennsylvania law, a cause of action in contract accrues at the time of breach. *Colonial Assurance Co. v. The Mercantile & General Reinsurance Co.*, 297 F.Supp.2d 764, 769–70 (E.D.Pa.2003). A breach of contract is the "non-performance of any contractual duty of *immediate* performance." *Barnes v. McKellar*, 434 Pa.Super. 597, 644 A.2d 770, 775 (1994) (quoting *Camenisch v. Allen*, 158 Pa.Super. 174, 44 A.2d 309, 310 (1945) (adopting Restatement definition) (emphasis added)). The renunciation of a contractual duty before the time fixed in the contract for performance is an

---

tom and usage of terms in the industry and that the principle of regulatory estoppel might be applicable when interpreting the CGL policies. *See generally, Sunbeam*, 566 Pa. 494, 781 A.2d 1189. Simon's December 20, 2002 letters to defendants AIU and Liberty Mutual stated, "We believe that the pollution exclusion language in the applicable insurance policies, and your reservations or coverage decisions based thereon, should be reexamined in light of the *Sunbeam Corp.* case.... [W]e submit that the pollution exclusion is legally inapplicable in this case based upon the court's holding in the *Sunbeam Corp.* case." (Stipulation Ex. J at SMW01071, Ex. K at SMW01145.)

11. Defendant CNA does not make a similar motion since its first response letter to Simon's request for coverage was in 2000 and the instant suit was filed in 2003, well within any construction of the statute of limitations for a contract claim.

anticipatory repudiation which ripens into a breach prior to the time for performance only if the injured party elects to treat it as such. *Franconia Assoc. v. United States*, 536 U.S. 129, 143, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002) (citing Restatement (Second) of Contracts (1979)). *See also McCormick, v. Fidelity & Cas. Co. of New York*, 307 Pa. 434, 438–39, 161 A. 532 (Pa.1932) (holding that if there is an anticipatory breach, the injured party may unequivocally and affirmatively accept such a breach and sue at once or the injured party can reject the anticipatory breach and the contract remains in full force). If the injured party elects to place the repudiator in breach before the performance date, the accrual date of the cause of action is accelerated from the time of performance to the date of such election. *Franconia*, 536 U.S. at 144, 122 S.Ct. 1993. But if the injured party instead opts to await performance, the cause of action accrues, and the statute of limitation starts to run, from the time fixed for performance rather than from the earlier date of repudiation. *Id.* The alleged breaching party could, of course, also bring a declaratory judgment action at the time of its alleged repudiation to clarify its responsibilities under the contract.

Defendants AIU and Liberty Mutual argue that the statute of limitations for Simon's breach of contract claim started running at the time of their October 1997 denial letters and, therefore, the instant breach of contract claims, filed in 2003, are barred by the statute of limitations. In order to determine whether the statute of limitations has expired for Simon's breach of contract claims against AIU and Liberty Mutual, I must first determine when there was a breach of contract. If AIU and Liberty Mutual had an immediate duty to perform at the time of their initial denial letters in October 1997, then those denials were a non-performance of that duty, constituting a breach of contract and triggering the limitations period. On the other hand, if AIU and Liberty Mutual did not have a duty to perform at the time of their initial denial letters, then the letters constituted an anticipatory breach which Simon chose not to treat as an actual breach, and the limitations period did not start running until actual performance was due.[12] The time that an actual performance is due is controlled by the insurance contract.

■■■■ There are certain general principles that govern the interpretation of insurance contracts in Pennsylvania. In interpreting an insurance contract, the goal is to "ascertain the intent of the parties as manifested by the language of the written instrument." *Gene & Harvey Builders v. Pennsylvania Mfrs. Assoc.,*

---

12. Defendants AIU and Liberty Mutual argue that under *Adamski*, the statute of limitations for both the bad faith claim and the breach of contract claim started running at the same time. (Mem. of Law in Supp. of Def. Liberty Mutual's Mot. for Summ. J. at 9; Joinder of Def. AIU to Def. Liberty Mutual's Mot. for Summ. J.) However, the *Adamski* court only considered a bad faith claim and stated that a "bad faith action under section 8371 is neither related to nor dependent on the underlying contract claim against the insurer." 738 A.2d at 1039 n. 5. The *Adamski* court also specifically distinguished the start of the limitations period for a bad faith claim from the start of the limitations period for a breach of contract claim. *Id.* at 1042 n. 8 (citing and distinguishing *UTI Corp. v. Fireman's Fund Ins. Co.*, 896 F.Supp. 362 (D.N.J.1995) (holding that, under Pennsylvania law, the statute of limitations for the breach of contract action did not commence until settlement of the underlying action)). Additionally, in determining the proper statute of limitations period for an action under 42 Pa.C.S. § 8371, the bad faith statute, the Third Circuit held that a statutory insurance bad faith action sounds in tort and not in contract. *Haugh*, 322 F.3d at 233–36.

512 Pa. 420, 517 A.2d 910, 913 (1986). "When the language of an insurance contract is clear and unambiguous, a court is required to enforce that language." *Medical Protective Co. v. Watkins* 198 F.3d 100, 103 (3d Cir.1999). Although any ambiguity should be construed against the insurer, *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 814 (3d Cir.1994), if possible, a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions. *Medical Protective Co.*, 198 F.3d at 103 (internal citations omitted). The language of the policy should not be tortured to create ambiguities that do not exist. *Lucker Mfg.*, 23 F.3d at 814. A provision is ambiguous only if "reasonable persons considering the relevant language in the context of the entire policy" could differ as to its meaning. *Id.* If the language is clear and unambiguous, courts are to give effect to its plain and ordinary meaning. *Houghton v. American Guar., Life Ins. Co.*, 692 F.2d 289, 291 (3d Cir. 1982). The mere fact that a term used in the policy is not defined does not make the policy ambiguous. *Borish v. Britamco Underwriters, Inc.*, 869 F.Supp. 316, 319 (E.D.Pa.1994). Courts should give undefined contract terms their common meaning. *Id.*

AIU's and Liberty Mutual's CGL policies contain the following language:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury or ... property damage to which this [insurance] policy applies, caused by an occurrence, and the company shall have the right and *duty to defend any suit* against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investi-

> gation and settlement of any *claim or suit* as it deems expedient....

(Def. Liberty Mutual's Mot. for Summ. J. Ex. P at LM Simon0000676; Pl.'s Resp. to Def.'s Mot. for Summ. J./Cross–Mot. for Summ. J. Ex. R at AIU000300 (emphasis added).)

Under the above insurance contract clause, AIU and Liberty Mutual had a "duty to defend any suit" against Simon seeking damages on account of injuries or damages to which the policy applied. The language of the policy indicates that AIU and Liberty Mutual did not have a duty to defend Simon until there was a "suit" against Simon. Therefore, there was only a duty of immediate performance at the time of AIU's and Liberty Mutual's initial denial letters if the EPA PRP letter sent to Simon, which Simon requested coverage for, was a "suit." If the PRP letter were a suit, then AIU's and Liberty Mutual's initial denial letters were a non-performance of an immediate duty and the statute of limitations started running at the time of those letters. However, if the PRP letter was not a "suit" that triggered the insurer's duty to defend, then there was not a breach of a duty of immediate performance and the statute of limitations did not start running in October 1997. The Pennsylvania courts have not yet determined whether an EPA PRP letter constitutes a "suit" that triggers an insurer's duty to defend.

■ In common usage, the word "suit" refers to a proceeding in a court of law. *Black's Law Dictionary* 1434 (6th ed. 1990) ("Suit" is "[a] generic term, of comprehensive signification, referring to any proceeding by one person or persons against another or others in a court of law in which the plaintiff pursues, in such court, the remedy which the law affords him.... Term 'suit' has generally been replaced by term 'action,' which includes both actions at law and in equity."); *Web-*

*ster's New Collegiate Dictionary* 1180 (9th ed. 1987) ("[S]uit" is "an action or process in a court for the recovery of a right or claim."). In the context of AIU's and Liberty Mutual's entire policies, the word "suit" and the word "claim" are used separately and distinctly. Under their policies, the insurers have the discretion to settle or investigate any "suit or claim" but only have a duty to defend any "suit." [13] In order to give the policies' distinction between "claim" and "suit" any meaning, the word "suit" must be given its common meaning, that of a civil action filed in a court of law,[14] whereas a claim would be anything falling short of a suit. Under the terms of AIU's and Liberty Mutual's CGL policies and under Pennsylvania's rules of insurance contract interpretation, the PRP letter is a claim rather than a suit and allows the insurers the discretion to investigate or settle, but does not trigger their duty to defend. In fact, at oral arguments on the instant motions, held on December 22, 2004, defendants AIU and Liberty Mutual took the position that they do not have a duty to defend proceedings initiated by a PRP letter because it is not a suit.

 The conclusion that a PRP letter does not constitute a suit is consistent with Pennsylvania law on an insurer's duty to defend. Whether an insurer's duty to defend has arisen is determined by looking to the allegations of the underlying complaint. *General Accident Ins. Co. of America v. Allen,* 547 Pa. 693, 692 A.2d 1089, 1095 (1997). If the facts alleged in the underlying complaint fall even potentially within the policy coverage, the insurer has a duty to defend its insured against the complaint. *Id.* Thus, the duty to defend extends only to suits and not to allegations, accusations or claims which have not been embodied within the context of a complaint.

Other courts and states that have addressed the question of whether a PRP letter constitutes a suit triggering an insurer's duty to defend are split on the issue. Those finding that a PRP letter, or a similar notice from a state agency, does not constitute a "suit" include: *Foster–Gardner, Inc. v. National Union Fire Ins. Co.,* 18 Cal.4th 857, 77 Cal.Rptr.2d 107, 959 P.2d 265 (1998); *Linemaster Switch Corp. v. Aetna Life and Cas. Corp.,* 1995 WL 462270, 1995 Conn.Super. LEXIS 2229 (Conn.Super.1995); *Lapham–Hickey Steel Corp. v. Protection Mut. Ins. Co.,* 166 Ill.2d 520, 211 Ill.Dec. 459, 655 N.E.2d 842 (1995); and *Professional Rental, Inc. v. Shelby Ins. Co.,* 75 Ohio App.3d 365, 599 N.E.2d 423 (1991). Those finding that a PRP letter does constitute a "suit" and triggers a duty to defend include *SCSC Corp. v. Allied Mut. Ins. Co.,* 536 N.W.2d 305 (Minn.1995); *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.,* 445 Mich.

---

**13.** Liberty Mutual's policy repeats this distinction among "occurrence," "suit," and "claim" when outlining the insured's duty in each event. (Def. Liberty Mutual's Mot. for Summ. J. Ex. P at LM Simon0000679.)

**14.** In December of this year, the United States Supreme Court made a similar finding that the words "civil action" in CERCLA § 113(f)(1) required that a private party seeking contribution under this section must have been sued under CERCLA § 106 or § 107(a) before obtaining contribution from other potentially responsible parties. *Cooper Industries, Inc. v. Aviall Services, Inc.,* —— U.S. ——, ——, 125 S.Ct. 577, 579–80, —— L.Ed.2d —— (2004). Private parties that incur response costs voluntarily and are not themselves subject to suit do not have a cause of action under CERCLA § 113(f)(1). —— U.S. at —— ——, 125 S.Ct. at 583–84. While the plaintiffs in the *Action Mfg.* suit may have been sued by the EPA, there is nothing in the record to indicate that Simon was ever sued by the EPA. Without any suit, a duty to defend did not arise, there was no actual breach of contract, and the statute of limitations could not have started to run.

558, 519 N.W.2d 864 (1994); *Coakley v. Maine Bonding & Casualty Co.*, 136 N.H. 402, 618 A.2d 777 (1992); and *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 Mass. 689, 555 N.E.2d 576 (1990).

Some of the courts finding that a PRP letter is a "suit" determined that the word "suit" was ambiguous and capable of application to legal proceedings initiated in non-court settings. *See, e.g., Michigan Millers Mut. Ins. Co.*, 519 N.W.2d at 870. Other courts finding that a PRP letter is a "suit" analyzed the consequences of the receipt of a PRP letter and found that the consequences were similar enough to the commencement of a lawsuit that a duty to defend arose immediately. *See, e.g., Hazen Paper Co.*, 555 N.E.2d at 581.

Those courts finding that a PRP letter or its equivalent is not a "suit" found that the word "suit" is unambiguous and gave the word its plain meaning, which requires the commencement of a civil action in a court of law before an insurer's duty to defend is triggered. *See, e.g., Lapham–Hickey Steel Corp.*, 211 Ill.Dec. 459, 655 N.E.2d at 847; *Foster–Gardner, Inc.*, 77 Cal.Rptr.2d 107, 959 P.2d at 280. Illinois law on the interpretation of insurance contracts is similar to Pennsylvania's in that the court must construe the policy as a whole to determine the meaning of words and the parties' intent; a policy term is not ambiguous simply because it is not defined within the policy; a court cannot read ambiguity into the policy; and if a policy provision is unambiguous, a court must give the words of the provision their plain, ordinary and popular meaning. *Lapham–Hickey Steel Corp.*, 211 Ill.Dec. 459, 655 N.E.2d at 846. The Illinois court agreed with other state courts that the word "suit" is unambiguous. *Id.* at 847. The Illinois court also found, in considering a policy that contained a similar use of "claim" and "suit" as in the policies before

me, that the policy's distinction between the word "suit" and "claim" must be respected. "If the word 'suit' was broadened to include 'claim,' in the face of policy language which distinguishes between the two, any distinction between these two words would become superfluous." *Id.* at 847–48. Thus, the Illinois court concluded that the EPA PRP letter did not initiate a suit and the insurance company did not have to cover defense costs expended by the insured in response to the PRP letter. *Id.* at 848.

California law on the interpretation of insurance contracts is also similar to Pennsylvania's law in that the intent of the parties should be inferred solely from the written provisions of the contract; if the contract is clear and explicit, it governs; and the fact that a term is not defined in the policies does not make it ambiguous. *Foster–Gardner, Inc.*, 77 Cal.Rptr.2d 107, 959 P.2d at 272–73. The California court held that the clear and unambiguous meaning of the word "suit" in the insurance policies meant "a civil action commenced by a filing of a complaint. Anything short of this is a 'claim.'" *Id.* at 279. In reaching its conclusion, the California court noted that the words "suit" and "claim" were treated separately in the insurance policies, and it noted that the determination of an insurer's duty to defend depends on the allegations contained in a complaint. *Id.* at 280–81. The California court concluded that an order from the California Environmental Protection Agency identifying the insured as a party potentially responsible for environmental pollution did not trigger a duty to defend on the part of the insurers because the order was not a suit. *Id.* at 287. The reasoning of the Illinois Supreme Court and the California Supreme Court is in line with Pennsylvania law on the interpretation of insurance contracts and supports the conclusion that, in anticipating a ruling by the Penn-

sylvania Supreme Court, a PRP letter would not constitute a "suit" triggering a duty to defend.

In order for the statute of limitations on Simon's breach of contract claim to have begun to run when AIU and Liberty Mutual refused to defend Simon in 1997 in front of the EPA, AIU and Liberty Mutual needed to be under an immediate obligation to defend. Under my analysis as to what the Pennsylvania Supreme Court would rule on this issue, AIU and Liberty Mutual had no duty to defend Simon in 1997 before the EPA for proceedings arising from the PRP letter. Therefore, AIU and Liberty Mutual's refusals to defend were anticipatory breaches. Under Pennsylvania law, an anticipatory breach does not trigger the running of the statute of limitations unless the allegedly injured party, Simon in this case, chooses to bring suit at the time of the anticipatory breach challenging the position of the alleged repudiators, AIU and Liberty Mutual. Simon did not choose to do so at that time.[15] Because AIU and Liberty Mutual did not have an immediate duty to defend Simon when Simon notified them of its receipt of the PRP letter, their refusals to defend, manifested in their October 1997 denial letters, could not have been the basis for actual, as opposed to anticipatory, breaches of contract that would trigger the start of the limitations period.

▉ Under the above-quoted insurance contract clause, AIU and Liberty Mutual also had an obligation to indemnify Simon only for the sums that it became "legally obligated to pay as damages" because of injuries or damages to which the insurance

applied. The contract is devoid of any language indicating that insurers had a duty to indemnify before the insured became legally obligated to pay damages. At the time of Simon's February 12, 1997 request for liability protection, Simon was not under a legal obligation to pay damages for contamination at the Malvern Site. Therefore, AIU and Liberty Mutual did not have an immediate duty to indemnify at the time of their October 1997 denial letters.[16] Because the duty to indemnify was not due at that time, the refusal to indemnify, like the refusal to defend, could not have been the basis for an actual, as opposed to an anticipatory, breach of contract which would trigger the start of the limitations period.

For the reasons stated above, AIU's and Liberty Mutual's motions for summary judgment as to Simon's breach of contract claim will be denied.

## C. Statute of Limitations for Simon's Claim for Declaratory Relief

▉ Defendant AIU and Liberty Mutual moved for summary judgment on Simon's claim for declaratory relief on the ground that the four-year statute of limitations applicable to breach of contract claims also applied to declaratory judgment actions. (Mem. of Law in Supp. of Def. Liberty Mutual's Mot. for Summ. J. at 15; Joinder of Def. AIU to Def. Liberty Mutual's Mot. for Summ. J.) The statute of limitations for a declaratory judgment action is the same as the substantive underlying legal remedy. *See Algrant v. Evergreen Valley Nurseries Ltd. Partnership*, 126 F.3d 178, 184–85 (3d Cir.1997) (holding that "when plaintiffs' claims are barred by

---

**15.** Nor did AIU or Liberty Mutual choose to bring a declaratory judgment action clarifying their obligations under the insurance policies.

**16.** The question of whether Simon could have waited until the end of the *Action Mfg.* suit to

bring a claim for breach of contract on the basis of the insurers' duty to indemnify is not before me, and I do not make any conclusions as to this question.

a statute of limitations applicable to a concurrent legal remedy, then a court will withhold declaratory judgment relief in an independent suit essentially predicated upon the same cause of action"). Because Simon's breach of contract claim is not barred by the statute of limitations, Simon's claim for declaratory relief similarly is not barred. AIU's and Liberty Mutual's motion for summary judgment on Simon's claim for declaratory relief is denied.

### D. Declaratory Judgment on Defendants' Duty to Defend

■■■ Simon moves for summary judgment on AIU's, Liberty Mutual's, and Transportation's duty to defend Simon in the *Action Mfg.* suit. Under Pennsylvania law, determining whether an insurance company has a duty to defend an insured in an underlying action is a two part inquiry. "A court's first step in a declaratory judgment action concerning insurance coverage is to determine the scope of the policy's coverage." *General Accident Ins. Co. of America v. Allen,* 547 Pa. 693, 692 A.2d 1089, 1095 (1997). "[T]he inquiry into coverage is independent of and antecedent to the question of duty to defend." *Lucker Mfg. v. Home Ins. Co.,* 23 F.3d 808, 813–14 (3d Cir.1994). After determining the scope of the coverage, the court must examine the complaint in the underlying action to ascertain if it triggers coverage. *General Accident Ins. Co. of America,* 692 A.2d at 1095. The duty to defend is broader than the duty to indemnify. *Id.* In determining the duty to defend, the complaint should be read generously and the insurance company is obligated to defend an insured whenever *any* of the allegations in the complaint *potentially* fall within the policy's coverage, *Lucker Mfg.,* 23 F.3d at 813 (emphasis added). The duty to defend remains with the insurer until the insurer can confine the underlying action to a recovery that is not within the scope of the policy. *Imperial Casualty & Indemnity Co. v. High Concrete Structures, Inc.,* 858 F.2d 128, 132 (3d Cir.1988) (internal citations omitted). However, before examining the underlying complaint, the court must interpret the insurance contract.

Simon argues that it is entitled to summary judgment on the insurance company defendants' duty to defend because "there are no genuine issues of material fact regarding the two key factors that determine the duty to defend: (1) the relevant language of the Comprehensive General Liability Insurance Policies for the policy periods at issue; and (2) the Action Manufacturing Suit's allegations against the Simon Policyholders." (Pl.'s Resp. to Def.'s Mot. for Summ. J./Cross–Mot. for Summ. J. at 35.) Simon argues that the Pennsylvania Supreme Court's decision in *Sunbeam Corp. v. Liberty Mutual Ins. Co.,* 566 Pa. 494, 781 A.2d 1189 (2001), at the very least has raised uncertainty as to the applicability of the pollution exclusion clause and that any uncertainty should be resolved in favor of finding a duty to defend. (Pl.'s Reply in Supp. of Cross–Mot. for Summ. J. at 6.)

Simon's argument fails because, in light of *Sunbeam,* there exist genuine issues of material fact as to the interpretation of the insurance contract and its coverage, a necessary first step in determining whether there is a duty to defend. In *Sunbeam,* plaintiff manufacturing companies sued defendant insurance companies for the costs of cleaning up "unexpected and unintended" environmental pollution under their comprehensive general liability policies. 781 A.2d at 1191. The trial court dismissed the complaint on the grounds that the policies would only cover pollution if it was "sudden and accidental," that the meaning of that phrase was unambiguous, and that the policies did not cover pollution

which occurred gradually over a long period of time whether or not the pollution was unexpected and unintended. *Id.* The Pennsylvania Supreme Court reversed, holding that dismissal was improper because (1) the complaint sufficiently alleged grounds for regulatory estoppel, and (2) the complaint sufficiently alleged that the words "sudden and accidental," in accordance with custom in the industry or usage in the trade, could include pollution that was "unexpected and unintended." *Id.* at 1192–93, 1195.

Under the doctrine of regulatory estoppel, insurance companies, having represented to regulatory agencies in 1970 that new language in the comprehensive general liability policies—"sudden and accidental"—would not result in any significant decrease in coverage from the prior language, will be estopped from asserting the opposite position when claims are made by the insured policyholders. *Sunbeam*, 781 A.2d at 1192–93. In order to determine whether the doctrine of regulatory estoppel should apply in interpreting the coverage of insurance policies, a court would have to make factual findings as to whether the insurance industry made such a representation to the Pennsylvania insurance department and whether the insurance department relied on this representation when it approved the disputed language for inclusion in standard comprehensive general liability policies without a reduction in premiums to balance a reduction in coverage. *Id.* at 1192.

The *Sunbeam* court also held that when interpreting contracts "custom in the industry or usage in the trade is always relevant and admissible in construing commercial contracts and does not depend on any obvious ambiguity in the words of the contract." *Id.* at 1193. The Pennsylvania Supreme Court did not find any inherent ambiguity in the meaning of the phrase "sudden and accidental," and it specifically did not rule on the validity of *Lower Paxton Twp. v. U.S. Fidelity & Guaranty Co.*, 383 Pa.Super. 558, 557 A.2d 393 (Pa.Super.1989) (holding that the phrase "sudden and accidental" was unambiguous and its plain meaning required that damages resulting from gradual releases of pollution were excluded from coverage). *Sunbeam*, 781 A.2d at 1193–94. Thus, under Pennsylvania case law, the phrase "sudden and accidental" contains no ambiguity that can be construed in favor of the insured.

*Sunbeam's* application to the instant case requires that before determining the scope of coverage under the insurance contract, a court must make findings as to the applicability of regulatory estoppel and as to the custom and usage of the term "sudden and accidental" in the insurance industry. These findings involve material facts which are not contained in the record before me. Determining the scope of coverage under the insurance contract is a necessary antecedent to deciding whether the allegations of the *Action Mfg.* complaint, which alleges a gradual, but unexpected and unintended pollution, fall within the scope of coverage and thus whether there is a duty to defend. Because there exist genuine issues of material fact as to the duty to defend, summary judgment is denied.

## V. CONCLUSION

For the reasons set forth above, AIU's and Liberty Mutual's motions for summary judgment as to Simon's bad faith claims are granted, CNA's motion for summary judgment as to Simon's bad faith claim is denied, AIU and Liberty Mutual's motions for summary judgment as to Simon's breach of contract claim are denied, AIU and Liberty Mutual's motions for summary judgment as to Simon's claim for declaratory relief are denied, and Simon's

motion for summary judgment as to the insurance company defendants duty to defend is denied.

### ORDER

AND NOW, this _____ day of December 2004, it is **ORDERED** that:

- Defendant AIU's motion for summary judgment (Docket # 38) is **GRANTED** in part and **DENIED** in part. Defendant AIU's motion for summary judgment is granted as to Plaintiff Simon's bad faith claims and denied as to plaintiff Simon's breach of contract and declaratory judgment claims;

- Defendant Liberty Mutual's motion for summary judgment (Docket # 37) is **GRANTED** in part and **DENIED** in part. Defendant Liberty Mutual's motion for summary judgment is granted as to Plaintiff Simon's bad faith claims and denied as to plaintiff Simon's breach of contract and declaratory judgment claims;

- Defendant Continental Casualty Co.'s and Transportation Ins. Co.'s motion for summary judgment (Docket # 39) is **DENIED**; and

- Plaintiff Simon's motion for summary judgment (Docket # 41) is **DENIED**.