# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Pennsylvania Manufacturers' Association Insurance Company, Petitioner | : : : : | |
| v. | : : | No. 330 M.D. 2015 Argued: May 12, 2020 |
| Johnson Matthey, Inc. and Pennsylvania Department of Environmental Protection, Respondents | : : : : : | |
| Johnson Matthey, Inc., Third-Party Petitioner | : : : : | |
| v. | : : : | |
| Continental Casualty Company, American Casualty Company of Reading, PA, and Federal Insurance Company, Third-Party Respondents | : : : : : : | |

**BEFORE:** HONORABLE P. KEVIN BROBSON, Judge
HONORABLE MICHAEL H. WOJCIK, Judge
HONORABLE J. ANDREW CROMPTON, Judge

**OPINION BY JUDGE BROBSON** **FILED: November 19, 2020**

Presently before the Court are cross-applications for partial summary relief in this insurance coverage dispute between Pennsylvania Manufacturers' Association Insurance Company (PMA), as insurer, and Johnson Matthey, Inc.

(Johnson Matthey), as insured.[1] PMA seeks a judicial determination that its duty to defend Johnson Matthey did not arise until May 12, 2010, the date on which the Pennsylvania Department of Environmental Protection (DEP) filed an amended complaint in *Department of Environmental Protection v. Whittaker Corporation and Johnson Matthey, Inc.*, (E.D. Pa., No. 08-cv-06010) (Underlying Action), naming Johnson Matthey as an additional defendant. PMA also seeks a judicial declaration that all remedial investigation (RI) and feasibility study (FS) expenses incurred by Johnson Matthey are indemnity, not defense, costs. In its application, Johnson Matthey seeks summary relief on its claims[2] that PMA has breached its duty to defend by failing to pay in full Johnson Matthey's counsel fees from May 31, 2015, forward. For the reasons that follow, this Court denies the cross-applications for summary relief.

## I. BACKGROUND

The record reveals the following facts. In a May 24, 2006 letter, DEP notified Johnson Matthey that it had been identified as a potentially responsible person (PRP) with respect to environmental contamination at a 13.7-acre parcel of land known as the Bishop Tube Site (Site), located in Chester County, which was owned by Johnson Matthey's predecessors. (Johnson Matthey Amended Counterclaims ¶10.) DEP alleged that from 1951 through April 1, 1969, Johnson Matthey's predecessors used hazardous substances to manufacture metal alloy tubes, which substances

---

[1] For purposes of its application only, PMA asks this Court to assume it issued policies to Johnson Matthey that cover the underlying claims of environmental liability. According to PMA, however, the existence of coverage remains in dispute. (PMA Application ¶6.)

[2] Johnson Matthey moves for summary relief on Count I (Declaratory Judgment) and Count II (Breach of Contract) of its Counterclaims against PMA.

2

contaminated the Site. Johnson Matthey denied liability and engaged legal counsel to defend it. On November 7, 2006, Johnson Matthey notified PMA of DEP's action.

From April 1, 1969, to April 1, 1979, PMA issued a series of commercial general liability policies to cover the liability of Johnson Matthey's predecessors for, *inter alia*, property damage. The coverage limits of $100,000 under the policies issued for periods from April 1, 1971, and April 1, 1979, have been exhausted. Coverage remains available, however, under two policies: the one covering April 1, 1969, to April 1, 1970, and the one covering April 1, 1970, to April 1, 1971. PMA did not insure Johnson Matthey or its predecessors after April 1, 1979.

On August 18, 2008, Johnson Matthey entered into a consent order and agreement with DEP, by which Johnson Matthey agreed to undertake certain actions at the Site, including preparation of a site investigation report, work plans, and an FS. The consent order was amended on August 4, 2009. The amended consent order authorized DEP to terminate the agreement, if not satisfied, and to "take over" the remediation and recover its costs from Johnson Matthey. (PMA Application for Partial Summary Relief, Ex. F, Dustin Armstrong Deposition, at 72, 76.)

Johnson Matthey hired Roux Associates, Inc. (Roux) to do the agreed-upon site studies, and Roux submitted an RI report to DEP in 2010 and in 2015. (*Id*. at 127.) DEP provided comments and demanded more investigation. (*Id*. at 128-129.) On June 10, 2019, Roux submitted a new RI report, to which DEP offered more comments. (*Id*. at 81-82.) Johnson Matthey's amended counterclaims aver that Johnson Matthey has sought payment from PMA for invoices totaling over $2.84 million for work done by Roux. As of the December 17, 2019 deposition of its corporate counsel, Johnson Matthey posited that the Roux invoices

3

exceed $3 million. (PMA Application for Partial Summary Relief, Ex. G, Amy Donahue-Babiak Deposition, at 274.)

On May 12, 2010, DEP added Johnson Matthey as a defendant in the Underlying Action, which DEP had initiated against Whittaker Corporation (Whittaker) on December 29, 2008, under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA)[3] and the Hazardous Sites Cleanup Act (HSCA)[4] for the cost of remediating the Site. The Underlying Action was then assigned to a suspended docket, when "certain aspects of the technical investigation were performed." (Johnson Matthey Amended Counterclaims ¶15.) In June 2017, the Underlying Action returned to the active docket. (*Id.*)

On June 2, 2010, PMA agreed to defend Johnson Matthey in the Underlying Action subject to a reservation of rights, including its right to assert the following defenses: "lost policies, exhaustion, owned property, voluntary payments and pre-tender costs, allocation, and other insurance." (Johnson Matthey Answer to PMA Motion for Summary Judgment (8/15/2016), John M. Hagan Affidavit, Ex. 3.) Thereafter, PMA advised that it would abandon the following defenses: "late notice, failure to cooperate, pollution exclusion (in the 4/1/70 – 4/1/71 policy), trigger-of-coverage, and the definition of occurrence." (*Id.*) PMA defended Johnson Matthey in the Underlying Action from 2010 until 2015.

On April 23, 2015, PMA notified Johnson Matthey that it would no longer provide a defense in the Underlying Action and would not pay the invoices of Johnson Matthey's legal counsel, Saul Ewing Arnstein & Lehr LLP (Saul Ewing)

---

[3] 42 U.S.C. §§ 9601-9675.

[4] Act of October 18, 1988, P.L. 756, *as amended*, 35 P.S. §§ 6020.101-.1305.

4

after May 31, 2015. PMA filed a declaratory judgment action with this Court to excuse it from Johnson Matthey's defense, asserting that it did not owe Johnson Matthey a defense under the two policies.[5]

PMA moved for summary relief on the duty to defend question. On April 21, 2017, this Court denied PMA's motion for summary relief. We concluded that under its "occurrence policies," PMA was obligated to provide Johnson Matthey a defense. In *J.H. France Refractories Company v. Allstate Insurance Company*, 626 A.2d 502 (Pa. 1993), our Supreme Court held that occurrence policies provide protection from the date of the exposure to the date of first manifestation. Accordingly, multiple policies can be triggered by a single loss. Relying on *J.H. France Refractories*, this Court observed that the "multiple trigger of coverage" is due to "the long latency of the claim for which coverage was sought." *Pa. Mfrs.' Ass'n Ins. Co. v. Johnson Matthey, Inc. & Pa. Dep't of Envtl. Prot.*, 160 A.3d 285, 292 (Pa. Cmwlth. 2017). DEP's amended complaint in the Underlying Action alleged that contamination at the Site occurred gradually at indefinite points of time, with the first manifestation of injury in 1980. This triggered PMA's 1969-1970 and 1970-1971 policies because "undetected environmental contamination occurred during the policy period." *Id*. at 294. PMA's evidence did not rule out contamination during the policy periods, and it did not show manifestation before the policy periods. Where litigation involves facts potentially within the scope of the policy's coverage, the insurance company has a duty to defend the action until all covered claims are removed from the action. *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 541 (Pa. 2010).

---

[5] PMA named DEP as a respondent solely because its interests as the plaintiff in the Underlying Action would be affected by the denial of coverage. *See Vale Chem. Co. v. Hartford Accident & Indem. Co*., 516 A.2d 684, 687-88 (Pa. 1986). PMA seeks no relief from DEP.

## II. PMA'S APPLICATION FOR PARTIAL SUMMARY RELIEF[6]

On March 3, 2020, PMA filed an application for partial summary relief, seeking the following declaratory rulings: (1) that any expenses incurred by Johnson Matthey related to the Site prior to May 12, 2010, when it was added as defendant by DEP in the Underlying Action, shall not be deemed defense costs under the applicable PMA policies; and (2) that all RI and FS expenses incurred by Johnson Matthey pursuant to the amended consent order dated August 4, 2009, are indemnity, not defense, costs under the applicable PMA policies.

### A. Pre-May 12, 2010 Expenses

#### 1. Summary of Arguments

PMA argues that the costs Johnson Matthey incurred prior to May 12, 2010, are not reimbursable as defense costs because they predated any "suit." The policies at issue provide, *inter alia*:

> The [insurance] company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
>
> . . . .
>
> Coverage B. property damage
>
> to which this insurance applies, caused by an occurrence, *and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property*

---

[6] Summary relief under Pennsylvania Rule of Appellate Procedure 1532(b) is available where the "party's right to judgment is clear and no material issues of fact are in dispute." *Gregory v. Pa. State Police*, 185 A.3d 1202, 1205 n.5 (Pa. Cmwlth. 2018). For summary relief purposes, the record "is the same as a record for purposes of a motion for summary judgment" and includes pleadings, depositions, answers to interrogatories, admissions, affidavits, and reports signed by expert witnesses. *Summer Sch., Inc. v. Dep't of Educ.*, 108 A.3d 192, 195-96 (Pa. Cmwlth. 2015). "When ruling on an application for summary relief, we review the record in the light most favorable to the nonmoving party, resolving all doubts as to existence of a disputed material fact against the moving party." *Id.* at 196.

*damage*, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

(PMA Amended Petition for Review ¶16, Ex. C at 2, § I (emphasis added).) PMA argues that the term "suit" must be understood as a proceeding in a court of law. It is undisputed that DEP did not name Johnson Matthey as defendant in the Underlying Action until May 12, 2010. (PMA Brief at 15 (citing *Simon Wrecking Co. v. AIU Ins. Co.*, 350 F. Supp. 2d 624 (E.D. Pa. 2004)).)

In response, Johnson Matthey urges this Court to follow the majority of jurisdictions in this country, which have held that PRP letters are the "functional equivalent of suits" for purposes of triggering the insurance company's coverage under a commercial general liability policy. (Johnson Matthey Brief at 6 n.8 (citing, *e.g.*, *Aetna Cas. & Surety Co., Inc. v. Pintlar Corp.*, 948 F.2d 1507 (9th Cir. 1991); *R.T. Vanderbilt Co., Inc. v. Cont'l Cas. Co.*, 870 A.2d 1048 (Conn. 2005)).) Alternatively, Johnson Matthey contends that discovery is needed on PMA's "understanding, past and present, regarding the meaning of the word 'suit' as used in its policies." (Johnson Matthey Brief at 10.)

### *2. Analysis*

Insurance policies are contracts. *Jerry's Sport Ctr.*, 2 A.3d at 540. The task of interpreting a contract is generally performed by a court, not a jury. *Gene & Harvey Builders v. Pa. Mfrs.' Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1986). The interpretation of insurance policies is governed by the mutual intent of the parties at the time they formed the contract, and such intent will be inferred from the written provisions of the contract. *Jerry's Sport Ctr.*, 2 A.3d at 540. Because "insurance policies are often adhesion contracts prepared by the insurer on its own

7

forms, ambiguities in the policy should be resolved against the insurer and not against the policy holder." *Treasure Craft Jewelers, Inc. v. Jefferson Ins. Co. of N.Y.*, 583 F.2d 650, 652 (3d Cir. 1978); *Bishop v. Washington*, 480 A.2d 1088, 1094 (Pa. Super. 1984).

Here, the policies obligate PMA to defend where there is a "*suit* against [Johnson Matthey] seeking damages on account of such bodily injury or property damage," and PMA "may make such investigation and settlement of *any claim or suit* as it deems expedient[.]"  (PMA Amended Petition for Review ¶16, Ex. C at 2, § I (emphasis added).)  The policies do not define the term "suit"; as such, any doubt as to the meaning of the term and any ambiguity should be resolved in Johnson Matthey's favor.

While Pennsylvania's appellate courts have not yet addressed the question of whether an environmental agency proceeding prior to the filing of a complaint in a court of law is a "suit" within the meaning of a general liability policy, numerous other state and federal courts have considered this issue.  These decisions arose in CERCLA proceedings, state proceedings pursuant to statutes modeled after CERCLA, or both.

In *Simon Wrecking Co.*, the United States District Court for the Eastern District of Pennsylvania construed "suit" to refer to a proceeding in a court of law.  In that case, the Environmental Protection Agency (EPA) issued a PRP letter for a contaminated site to the insured in November 1996.  In February 1997, the insured provided notice of potential liability to its insurers.  In October 1997, two insurers responded by denying coverage.  In 1999, other PRPs entered into a consent decree that gave them the right to file suit against the non-settling parties, including the

8

insured.  On December 9, 2002, the PRPs to the consent decree filed a complaint against the insured.

In 2003, the insured brought an action seeking declaratory judgment that the insurers had a duty under their general liability policies to defend and indemnify it in connection with the contaminated site.  The policies contained coverage language similar to the policies in the instant case:

> The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury or . . . property damage to which this [insurance] policy applies, caused by an occurrence, *and the company shall have the right and duty to defend any suit* against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient.

*Simon Wrecking Co.*, 350 F. Supp. 2d at 636 (emphasis added).

The insurers moved for summary judgment, arguing, *inter alia*, that the insured's action was barred by the four-year statute of limitations.  They claimed that any breach of the duty to defend occurred when they denied coverage in writing in October 1997.  In interpreting the term "suit," the district court looked to Black's Law Dictionary and Webster's New Collegiate Dictionary for the term's "common usage," which refers to a proceeding in a court of law.  *Simon Wrecking*, 350 F. Supp. 2d at 637.  The district court noted that the policies used the term "suit" and "claim" separately and distinctly:  the insurers have the discretion to settle or investigate any "suit or claim" but only have a duty to defend any "suit."  To give the distinction between "suit" and "claim" any meaning, the district court opined that the term "suit" must mean a civil action filed in a court of law, whereas a claim would be "anything falling short of a suit."  *Id.*; *see also Foster-Gardner, Inc. v.*

9

*Nat'l Union Fire Ins. Co.*, 959 P.2d 265 (Cal. 1998) (holding that "suit" refers to actual court proceedings initiated by filing of complaint).[7]

The majority of jurisdictions, however, have held that a PRP letter issued by the EPA or a state environmental agency initiated an administrative "suit" that triggers an insurer's duty to defend.[8] One such case is *McGinnes Industrial Maintenance Corporation v. Phoenix Insurance Company*, 477 S.W.3d 786 (Tex. 2015), where the Texas Supreme Court adopted the majority view in holding that "suit" includes a CERCLA proceeding conducted by EPA.

In *McGinnes*, the insured brought an action in the United States District Court for the Southern District of Texas against its insurers for declaratory judgment that they owed a duty to defend the CERCLA proceedings arising from mill waste, which contaminated a nearby river. The district court granted partial summary judgment in favor of the insurers and certified its order for interlocutory appeal. The United States Court of Appeals for the Fifth Circuit certified to the Texas Supreme Court the question of "[w]hether the EPA's PRP letters and/or unilateral administrative order, issued pursuant to CERCLA, constitute a 'suit' within the meaning of the

---

[7] The United States District Court for the Eastern District of Pennsylvania took the same position in its unreported decision in *Sunoco, Inc. v. Illinois National Insurance Company*, (E.D. Pa., Civ. A. No. 04-4087, Jan. 11, 2007) (*Sunoco I*).

[8] *See, e.g., Aetna Cas. & Surety Co., Inc.*, 948 F.2d 1507; *R.T. Vanderbilt Co., Inc.*, 870 A.2d 1048; *Travelers Indem. Co. v. Summit Corp. of Am.*, 715 N.E.2d 926 (Ind. Ct. App. 1999); *A.Y. McDonald Indus. v. Ins. Co. of N. Am.*, 475 N.W.2d 607 (Iowa 1991); *Aetna Cas. & Sur. Co. v. Com.*, 179 S.W.3d 830 (Ky. 2005); *Hazen Paper Co. v. U.S. Fid. & Guar. Co.*, 555 N.E.2d 576 (Mass. 1990); *Michigan Millers. Mut. Ins. Co. v. Bronson Plating Co.*, 519 N.W.2d 864 (Mich. 1994); *SCSC Corp. v. Allied Mut. Ins. Co.*, 536 N.W.2d 305 (Minn. 1995); *Dutton-Lainson Co. v. Cont'l Ins. Co.*, 778 N.W.2d 433 (Neb. 2010); *Coakley v. Maine Bonding & Cas. Co.*, 618 A.2d 777 (N.H. 1992); *Certain Underwriters at Lloyd's London & Express Ins. Co. v. Mass. Bonding & Ins. Co.*, 230 P.3d 103 (Or. Ct. App. 2010).

[commercial general liability] policies, triggering the duty to defend." *McGinnes*, 477 S.W.3d at 790.

The Texas Supreme Court recognized that "suit" commonly refers to a proceeding in court. In the context of the general liability policies, however, the court held that the term must also include CERCLA enforcement proceedings by the EPA. The court stated cogently the reasons for its holding:

> The PRP notice letters serve as pleadings. The EPA obtains discovery through requests for information, indistinguishable from interrogatories under the rules of civil procedure. It engages in mediation through its invitations to settle. A unilateral administrative order resembles summary judgment. The fines and penalties for willful non-cooperation in the process are like sanctions in a court proceeding, only prescribed by statute. And part of the judicial function is ceded to the EPA by limiting a PRP's opportunity for review until the end of the process, and then limiting that review to an abuse of discretion by the EPA, based on its own record.
>
> [The insured] argues that EPA proceedings are the functional equivalent of a suit, but in actuality, they are the suit itself, only conducted outside a courtroom. Had the EPA wanted to force [the insured] to clean up the [contamination s]ite before 1980, it would have been required to sue first, and the [comprehensive general liability] policies would have obligated the [i]nsurers to defend—to challenge the pleadings, to contest the scope of discovery, to engage in mediation on a level playing field, to resist judgment, and to settle—all without fear of being sanctioned at the very end for not having cooperated with the opponent. CERCLA effectively redefined a "suit" on cleanup claims to mean proceedings conducted by one of the parties, the EPA, followed by an enforcement action in court, if necessary. [The insured's] rights under its policies should not be emasculated by the enactment of a statute intended not to affect insurance, but to streamline the EPA's ability to clean up pollution.

*McGinnes*, 477 S.W.3d at 791.

11

Upon review of CERCLA and HSCA, which was modeled after CERCLA,[9] we find the reasoning in *McGinnes* persuasive. CERCLA gives states the right to recover costs incurred in cleaning up a contamination site from a PRP, and once an entity is identified as a PRP, it may be compelled to reimburse the government for past and future response costs. *Pa. Dep't of Envtl. Prot. v. Trainer Custom Chem., LLC*, 906 F.3d 85, 89-90 (3d Cir. 2018) (citing 42 U.S.C. § 9607). Liabilities that the insured incurs in response to a PRP letter, if any, are far from voluntary; indeed, ignoring a PRP letter brings legal consequences. Section 1102(a) of HSCA authorizes DEP to "issue orders to persons as it deems necessary to aid in the enforcement of the provisions of this act," such as "orders requiring response actions, studies and access." 35 P.S. § 6020.1102(a). "It shall be the duty of any person to proceed diligently to comply with an order issued under this section," or the person shall be found "guilty of contempt and shall be punished by the court in an appropriate manner." 35 P.S. § 6020.1102(c).

Further, DEP possesses adjudicative authority in CERCLA and HSCA proceedings. A PRP's response to the PRP letter may become part of the

---

[9] Section 102 of HSCA, 35 P.S. § 6020.102, provides, in relevant part:

The General Assembly finds and declares as follows:

. . . .

(7) [CERCLA] provides numerous opportunities for states to participate in the cleanup of hazardous sites. It is in the interest of the citizens of this Commonwealth that the Commonwealth be authorized to participate in such cleanups and related activities to the fullest extent.

. . . .

(12) The following are the purposes of this act:

(i) Authorize the [DEP] to participate in the investigation, assessment and cleanup of sites under [CERCLA] to the full extent provided by that act.

12

"administrative record,"[10] upon which DEP makes "findings of fact," determines its "response," and files a "statement of decision." 25 Pa. Code § 3.31. A PRP's challenge to DEP's selection and adequacy of a response action shall be limited to the administrative record developed under the statute, and DEP's decision is overturned by judicial review only when it is found "arbitrary and capricious." Section 508(c) of HSCA, 35 P.S. § 6020.508(c).

In sum, a PRP letter issued by DEP, backed by threats of penalties and sanctions, is more than a simple demand letter threatening a lawsuit or a "claim," as distinguished from a "suit" in the insurance policies. Like a civil complaint, the PRP letter commences a legal process to determine, subject only to review for abuse of discretion, the appropriate response action that a PRP must perform or fund to abate the pollution at a site. In other words, DEP, by issuing the PRP letter, initiated an administrative suit under CERCLA and HSCA against Johnson Matthey.

---

[10] Section 506(a) of HSCA, 35 P.S. § 6020.506, provides that the administrative record upon which a response action is based shall consist of all of the following:

    (1) The notice issued under subsection (b).

    (2) Information, including, but not limited to, studies, inspection reports, sample results and permit files, which is known and reasonably available to [DEP] and which relates to the release or threatened release and to the selection, design and adequacy of the response action.

    (3) Written comments submitted during the public comment period under subsection (c).

    (4) Transcripts of comments made at the public hearing held under subsection (d).

    (5) [DEP's] statement of the basis and purpose for its decision, including findings of fact, an analysis of the alternatives considered and the reasons for selecting the proposed response action, and its response to significant comments made during the public comment period.

    (6) The docket maintained under subsection (f), listing the contents of the administrative record.

13

To be sure, neither CERCLA nor HSCA existed when the policies at issue were issued, and, certainly, we cannot presume that PMA and Johnson Matthey's predecessors anticipated the kind of environmental cleanup costs imposed by DEP that are at issue here. Practices and procedures before administrative tribunals of this Commonwealth, like those of their federal counterparts, however, had been established at the time. For instance, the Administrative Agency Law of 1945[11] provided for procedures for administrative adjudications and judicial review. While we have no quarrel with PMA's reasoning that a "suit" must be more than a "claim," *Simon Wrecking Co.*, 350 F. Supp. 2d at 637, we cannot agree that an administrative suit, like the one brought by DEP in the instant case, is merely a "claim" and, thus, not subject to the defense requirement.

As the Texas Supreme Court pointed out in *McGinnes*, CERCLA effectively redefined "suit" on cleanup claims to mean proceedings conducted by the EPA, followed by an enforcement action in court, if necessary. *McGinnes*, 477 S.W.3d at 791. Likewise, our General Assembly enacted HSCA with a similar intent:

> (5) *Traditional legal remedies have not proved adequate* for preventing the release of hazardous substances into the environment or for preventing the contamination of water supplies. *It is necessary, therefore . . . to provide new remedies* to protect the citizens of this Commonwealth against the release of hazardous substances . . . .
>
> (6) *Traditional methods of administrative and judicial review have interfered with responses to the release of hazardous substances into the environment. It is, therefore, necessary to provide a special procedure* which will postpone both administrative and judicial review until after the completion of the response action.

---

[11] Act of June 4, 1945, P.L. 1388, *as amended*, *formerly* 71 P.S. §§ 1710.1-.111. The Administrative Agency Law of 1945 was repealed by the Act of April 28, 1978, P.L. 202. This act has been substantially recodified by the Administrative Agency Law, 2 Pa. C.S. §§ 501-508; 701-704.

14

Section 102(5), (6) of HSCA, 35 P.S. § 6020.102(5), (6) (emphasis added). PMA's proposed interpretation of the term "suit," if adopted, would compel the insured to ignore the PRP letter and force DEP to initiate a suit in a court of law to obtain insurance coverage. This could well entail much higher costs and expenses of defense, as prescribed under HSCA, and frustrate legislative intent.

For these reasons, we conclude that PMA's duty to defend was triggered on May 24, 2006, when DEP notified Johnson Matthey that it had been identified as a PRP with respect to environmental contamination at the Site. We also conclude that defense costs within commercial general liability policies include any costs incurred by a party defendant to either avoid or limit liability under CERCLA and HSCA. This Court thus denies PMA's summary relief to the extent it seeks a ruling that any expenses incurred by Johnson Matthey related to the Site prior to May 12, 2010, should not be deemed defense costs under the applicable PMA policies.

### B. RI and FS Costs

#### 1. Summary of Arguments

We now turn to the second declaratory ruling that PMA seeks in its application for partial summary relief, which is that the RI and FS costs incurred by Johnson Matthey for the Site must be characterized as indemnity costs, not defense costs. PMA contends that under the amended consent order, DEP can take over the remediation and recover its costs against Johnson Matthey as "damages," which would be payable as indemnity costs under applicable insurance policies. (PMA Brief at 16.) For this reason, PMA argues that Roux's invoices incurred as a result of performing RI and FS on behalf of Johnson Matthey should be allocated as indemnity payments.

15

PMA urges this Court to adopt the view of the United States District Court for the Eastern District of Washington in *Travelers Indemnity Company v. City of Richland*, (E.D. Wash., No. 4:17-cv-5200, May 30, 2018) (unreported). In that case, the City of Richland (Richland) operated a municipal landfill that allegedly had released hazardous substances. The state notified Richland that it was liable under the state's toxics control statute for remedial action costs and for all damages resulting from these releases. Richland entered into an "agreed order" with the state and agreed to undertake RI and FS for the landfill.

The insurer paid for Richland's defense costs incurred for the period between the state's preliminary determination notification and the execution of the agreed order. A dispute arose, however, with respect to the insurer's continued duty to defend after the agreed order, which prompted the insurer to commence the declaratory judgment action in federal court. In a partial summary judgment motion, the insurer asserted that its duty to defend ceased when Richland entered into the agreed order and that any costs of performing the RI and FS under the agreed order were "damages" and payable as indemnity, not defense costs.

The district court agreed with the insurer and granted its motion. The district court noted that the state's toxics control statute required that a "potential liable person" as found by the state environmental agency comply with the agreed order, which may be used to require or approve cleanup or other remedial actions. Although it was not filed with the court, the agreed order settled Richland's obligation to do the RI and FS for the landfill. The district court held that the RI and FS costs Richland incurred constituted "damages," because they were paid as a result of a liability imposed by law.

16

Johnson Matthey counters that it has served discovery requests on PMA that relate to this claim and must be permitted to proceed because of the "fact-intensive nature of PMA's claim." (Johnson Matthey Brief at 15.) Johnson Matthey contends that, in any event, "courts throughout the country" characterize RI and FS costs as defense costs because they are necessary, unavoidable expenses that would reduce the insured's ultimate liability. (Johnson Matthey Brief at 7 n.8 (citing, *e.g.*, *Aerojet-Gen. Corp. v. Transp. Indem. Co.*, 948 P.2d 909 (Cal. 1997), *Am. Bumper & Mfg. Co. v. Hartford Fire Ins. Co.*, 550 N.W.2d 475 (Mich. 1996)).)

## 2. Competing Views

Pennsylvania has not yet addressed the question of whether RI and FS costs incurred during a government-mandated cleanup process should, for insurance purposes, be regarded as defense costs or indemnity costs. Under CERCLA and its accompanying regulations, RI and FS costs are generally incurred to "assess site conditions and evaluate alternatives to the extent necessary to select a remedy." 40 C.F.R. § 300.430. Simply put, RI and FS costs do not include the actual remediation of the contamination. Policyholders often take the position that RI and FS costs should be characterized as defense costs, while primary insurers argue that such costs are indemnity costs so as to exhaust their contracts' limits of liability. Seaman & Schulze, ALLOCATION OF LOSSES IN COMPLEX INSURANCE COVERAGE CLAIMS, §10:5 (updated December 2019), at 2.

The district court's unreported decision in *Travelers*, on which PMA relies, represents the view taken by several state and federal jurisdictions that to the extent that costs were imposed upon insureds pursuant to CERCLA or similar state statutes in satisfaction of their claimed liability, they should be covered, if at all, as indemnity costs. These jurisdictions interpret the term "damages" in the environmental setting

17

broadly to bring all RI and FS costs within policy coverage. However, insureds generally expect that the insurer will investigate the potential liability of an insured under the insurer's duty to defend under the insurance contract, and, likewise, most insurers expect that they will incur these expenses. That the government orders the insured to perform an investigation does not change the character of the work or the initial expectation of the parties.

It is for that reason several other jurisdictions, attempting to discern how to characterize RI and FS costs, have focused not on the timing of costs or agreements with regulators, but on the nature or purpose of the work performed. In *Aerojet-General Corporation*, an insured instituted a declaratory judgment action against its insurer for coverage for losses resulting from groundwater contamination under the insured's industrial facility. At issue was whether site investigation expenses, including those incurred for determining the existence, nature, extent, and effect of the discharge of hazardous substances, constituted defense costs that the insurer must incur in fulfilling its contractual duty to defend. The California Supreme Court set forth a three-part analysis to address whether the insured's site investigation expenses constituted defense costs: (1) the site investigation must be conducted within the temporal limits of the insurer's duty to defend (*i.e.*, between tender of defense and conclusion of the action); (2) the site investigation must amount to a reasonable and necessary effort to avoid or at least minimize liability; and (3) the site investigation expenses must be reasonable and necessary for that purpose. *Id*. at 922. The court ultimately affirmed the lower court to the extent it held that site investigation expenses might constitute defense costs.[12]  *Id*. at 933.

---

[12] In *Aerojet-General Corporation*, the site investigation expenses were incurred after the insured had been sued in the court for environmental contamination. *Aerojet-General Corporation*
**(Footnote continued on next page…)**

Likewise, in *American Bumper*, an insured sued its liability insurers seeking to recover costs incurred in responding to governmental demands to investigate its seepage lagoon for possible violation of CERCLA. The Michigan Supreme Court held that the insurers had a duty to defend during the investigation process to determine whether the site was in fact contaminated and that the site investigation costs incurred after and in response to the PRP letter issued by the EPA were recoverable defense costs if they were expended to "defeat or limit the scope of liability and were not ordinary costs of doing business." *Id*. at 477. On the other hand, costs expended during the investigation process that "go toward remediation, or making a potentially injured party whole, are indemnification." *Id*. at 485. In sum, *Aerojet-General Corporation* and *American Bumper* distinguish between defense and indemnity costs in the context of CERCLA by defining defense costs as costs incurred to defeat or limit the scope of liability and indemnity costs as those incurred to compensate for damages.

A growing number of jurisdictions have taken a "middle-ground" approach in characterizing the RI and FS costs. In the seminal case *General Accident Insurance Company of America v. State, Department of Environmental Protection (N.B. Fairclough & Son, Inc.)*, 672 A.2d 1154 (N.J. 1996) (*Fairclough*), the insurer brought a declaratory judgment action concerning coverage under a general liability policy for groundwater cleanup claims against the insured. The insurer asserted that it owed no further duty to defend or indemnify the insured due to exhaustion of policy limits. The New Jersey Supreme Court remanded the matter to the trial court with instructions to fairly allocate the RI and FS costs between the defense and

thus did not involve the issue of an insurer's duty to defend its insured prior to a complaint being filed.

19

indemnity provisions of the insurance contract.[13]  The court held that there is a presumption that the government-mandated RI and FS costs are indemnity costs; however, that presumption may be overcome by the insured, who bears the burden of demonstrating that the insurance company would derive an unjust benefit from such an allocation to the extent it would relieve the insurance company of an expense that otherwise would have been incurred under its obligation to defend.  *Id*. at 1162.

In so holding, the court reviewed the Michigan (*American Bumper*) approach and observed that it is difficult to "draw[] the line between studies that will help to 'mitigate or reduce liability' and those that are done to 'correct the problem.'" *Id*. at 1160 (citing *Fireman's Fund Ins. Co. v. Ex-Cell-O Corp.*, 790 F. Supp. 1318 (E.D. Mich. 1992)).  The court opined that conservation of resources should be a goal of the decision-making, as "[courts] do not want to encourage needless litigation" and "must avoid, at all costs, another war of experts to determine how much of the costs should be allocated to defense and how much to indemnity." *Fairclough*, 672 A.2d at 1162.

The United States Court of Appeals for the Third Circuit, in a case governed by New Jersey substantive law, followed the approach in *Fairclough*.  *See Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 177 F.3d 210 (3d Cir. 1999) (holding excess insurer may rebut presumption that RI and FS costs are indemnity costs because classification of costs as defense costs would relieve it of

---

[13] The New Jersey Supreme Court further listed several factors for the trial court to consider, on remand, in making the allocation.  These factors include:  (1) the relative risk that the PRP bore if it did not conduct the RI and FS; (2) the extent to which the details of the RI and FS may have been mandated by the environmental agency; (3) the extent to which the RI and FS provided a means by which the insurance company or the policyholder would be relieved of, or be able to mitigate, potential claims for damages; and (4) the cost of preparing the RI and FS in relation to the policy limits provided.  *Fairclough*, 672 A.2d at 1162.

responsibility for such costs). In *Sunoco, Inc. v. Illinois National Insurance Company*, 503 F. Supp. 2d 743 (E.D. Pa. 2007) (*Sunoco II*), the United States District Court for the Eastern District of Pennsylvania, in a case governed by Pennsylvania substantive law, chose to apply the New Jersey presumption as well. It did so relying in part on its earlier decision in *Sunoco I* that a PRP letter does not even trigger an insurer's duty to defend under Pennsylvania law because it is not a "suit," as the district court defined that term:

> We find that the New Jersey presumption—that mandated clean-up costs are indemnity costs to be allocated to indemnity provisions of the policy, but allowing a policyholder to rebut that presumption by showing that the insurance company would derive an unjust benefit from such an allocation if it would relieve the insurance company of an expense that it would otherwise have incurred under its obligation to defend—should apply and that Sunoco has not demonstrated its entitlement to summary judgment on this record. Sunoco, as the moving party, presents no factual basis that would rebut the presumption that the expenses associated with [the consultant's] work to remediate the site and mitigate liability were indemnity expenses. We find no basis for determining that [the insurance company] derived an unjust benefit from this allocation, given our determination that expenses incurred pursuant to the . . . PRP letter and Consent Order cannot qualify as defense costs.

*Sunoco II*, 503 F. Supp. 2d at 754. As noted above, however, we disagree with the district court's narrow construction of the term "suit" in the policies as applying only to actions initiated in courts of law. Instead, applying our assessment of Pennsylvania law, we construe the undefined term "suit" as encompassing both actions initiated in a court of law to address environmental property damage and statutorily authorized alternative formal actions initiated by administrative agencies to address the same.

The United States District Court for the Northern District of New York developed yet another approach—equitable allocation. In *Endicott Johnson*

21

*Corporation v. Liberty Mutual Insurance Company*, 928 F. Supp. 176 (N.D. N.Y. 1996), the insured sought a declaration of coverage for claims based on insured's dumping of hazardous substances at two waste disposal sites. The insured moved for a declaratory ruling that all RI and FS costs it incurred were defense costs. The district court denied the motion and ruled that to the extent that an expense is primarily attributable to RI—which addresses the sources and extent of the contamination, whether environmental damage can be mitigated by controlling the sources, or whether additional action is necessary because of migration of contaminants from the site—the expense will be treated as a defense cost. To the extent that an expense is primarily attributable to FS—which comprises plans for selecting and implementing the remediation alternative for the site—the expense will be treated as damages to be indemnified. Indeterminate expenses will be allocated in an equitable manner. *Id.* at 184.

### 3. Analysis

After carefully considering the competing views outlined above, we conclude that a hybrid of the approaches taken in *Fairclough* and *Endicott Johnson Corporation* is most consistent with Pennsylvania law, in view of the policy language at issue and Johnson Matthey's obligations in the amended consent order.

An insurer's duty to defend is broader than its duty to indemnify. *Jerry's Sport Ctr.*, 2 A.3d at 541. The duty to defend is a distinct obligation "separate and apart from the insurer's duty to provide coverage" and arises when a claim may potentially come within the coverage of an insurance policy. *Id.*; *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa. 1987) (describing duty to defend as arising "whenever the complaint filed by the injured party may potentially come within the coverage of the policy"). While the insurer's

22

indemnity payments are subject to policy limits in commercial general liability insurance policies, defense payments may not be capped. As such, in most general liability policies, including the one at issue in the instant case, the duty to defend is also a "*right . . . to defend* any suit against the insured seeking damages on account of such bodily injury or property damage." (PMA Amended Petition for Review ¶16, Ex. C at 2, § I (emphasis added).) By undertaking the right to defend the insured, the insurer is benefited by "preserving its right to control the defense and to take actions to mitigate any future indemnification responsibilities." *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 948 A.2d 834, 848 (Pa. Super. 2008), *aff'd*, 2 A.3d 526 (Pa. 2010). Where a claim has the potential to trigger a policy's duty to indemnify the insurer (*i.e.*, pay damages), the insurer's refusal to defend at the outset of the controversy is a decision it makes at its own peril. *Jerry's Sport Ctr.*, 2 A.3d at 542. The insurer's duty to defend "exists until the claim is confined to a recovery that the policy does not cover." *Id.*

The insurance policy at issue provides that PMA "will pay on behalf of the insured all sums which the insured shall become *legally obligated to pay as damages*" and will "have the right and duty to defend any suit against the insured *seeking damages on account of such bodily injury or property damage*." (PMA Amended Petition for Review ¶16, Ex. C at 2, § I (emphasis added).) We reject PMA's assertion that all costs incurred by Johnson Matthey through Roux under DEP's amended consent order must be characterized as indemnity under the insurance policy. Instead, the costs must be allocated between defense and indemnity, or damages.

It is well established in Pennsylvania that the cost of restoring land to its original condition is recoverable in damages. In *Kirkbride v. Lisbon Contractors,*

*Inc.*, 560 A.2d 809 (Pa. Super. 1989), the Pennsylvania Superior Court stated the rule as follows:

> The measure of damages for injury to property is the cost of repairs where that injury is reparable unless such cost is equal to or exceeds the value of the injured property. Where the cost of repair does exceed the value of said property, the cost of damages becomes the value of the property. Where, however, the injury is deemed to be permanent, the measure of damages becomes the decrease in the fair market value of the property.

*Kirkbride*, 560 A.2d at 812 (citations omitted). In *Kirkbride*, the Superior Court affirmed a damage award in the form of restoration costs despite the defendant's contention that such costs were improper because they significantly exceeded the diminution in the value of the land. Because the injury was reparable, plaintiffs "were entitled to receive the costs of restoring their land back to its original condition." *Id.* at 813. The Superior Court held so by relying on the Supreme Court's decision in *Lobozzo v. Adam Eidemiller, Inc.*, 263 A.2d 432 (Pa. 1970), which "specifically noted that, with regard to remedial damage to realty, a plaintiff may recover only the cost of repair or restoration without regard to the diminution in value of the property." *Kirkbride*, 560 A.2d at 813. Consistently, we hold that under Pennsylvania law costs incurred in CERCLA and HSCA proceedings for purposes of repairing or restoring the land to its original condition are recoverable as "damages" and, therefore, are covered as indemnity costs under general liability insurance policies at issue in this matter. The damages recoverable, however, cannot exceed the value of the property. *Id.* at 812.

Turning to the actions Johnson Matthey was required to take at the Site, the amended consent order provides, in pertinent part:

> After full and complete negotiation of all matters set forth in this **AMENDED CONSENT ORDER AND AGREEMENT** (Amended Agreement) and upon mutual exchange of the covenants contained

24

herein, the parties intending to be legally bound, it is hereby **ORDERED** by [DEP] and **AGREED** to by Johnson Matthey and Whittaker as follows:

1. **Authority.** This Amended Agreement is an Order of the [DEP] authorized and issued pursuant to Sections 505(c) and 1102 of HSCA, 35 P.S. §[§] 6020.505(c) and 6020.1102. The failure of Johnson Matthey and/or Whittaker to comply with the terms and conditions of this Amended Agreement shall subject Johnson Matthey and/or Whittaker to any and all remedies available to the [DEP] for the violation of an Order.

   . . . .

3. **Environmental Investigations.** Environmental Investigations are defined as all of Johnson Matthey's and Whittaker's obligations as identified in Paragraph 5 of this Amended Agreement.

   . . . .

5. **Johnson Matthey's and Whittaker's Obligations.** Johnson Matthey and Whittaker shall:

   . . . .

   b. Prepare a Work Plans(s) for the completion of a Site Investigation that will characterize the following media and pathways at the Site: 1) Groundwater contamination contained within the bedrock originating from the [Site]; 2) Contaminated groundwater contained within the overburden (*i.e.* above the bedrock zone) originating from the [Site], and occurring on properties down-gradient from the [Site]; 3) The vapor intrusion pathway resulting from migration of contaminants from the [Site]; 4) The groundwater to surface water pathway, to determine whether, and if so where, contaminated groundwater resulting from the [Site] may be entering Little Valley Creek or other surface water features; 5) Performance of a Risk Assessment; and 6) a Feasibility Study (if necessary).

   . . . .

   f. The final Site Investigation Report shall conform to the requirements of Chapter 250.408 of the Land Recycling Program Regulations pertaining to Remedial Investigations conducted under the [DEP's] Land Recycling Program

(Act 2).[14]  The Feasibility Study Report (if necessary) shall be in accordance with "Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA, Interim Final" (October 1988) and shall include at least two remedial alternatives capable of meeting an Act 2 Standard or combination of Act 2 Standards.  Within 30 days of submitting any Final Feasibility Study Report, the parties shall advise the [DEP] in writing which, if any, contaminated media present at the Site require remediation to meet one or more standards established under Act 2.

. . . .

h.  Upon approval or modification of the Work Plan(s) and subject to Paragraph 13 (Force Majeure), Johnson Matthey and Whittaker shall implement the Site investigation in accordance with the Work Plan(s) and schedule contained therein as approved or modified by the [DEP].

(PMA Application for Partial Summary Relief, Ex. E, at 6-7.)  In sum, the amended consent order requires Johnson Matthey to perform a site investigation, subject to the approval of DEP, to characterize the scope and extent of the groundwater contamination originating from the Site and occurring on "properties down-gradient from the [Site]" and nearby surface waters.  (*Id*.)  The amended consent order further requires Johnson Matthey to submit an FS report, "if necessary," and select at least two remedial alternatives in compliance with CERCLA and Act 2 standards.  (*Id.*)

The site investigation must conform to the RI requirements in Section 250.408 of DEP's regulations, which "shall sufficiently define the rate of movement and the present and future extent and fate of contaminants, to ensure continued attainment of the remediation standard."  25 Pa. Code § 250.408.  Further, under Section 250.408(b):

---

[14] Land Recycling and Environmental Remediation Standards Act, Act of May 19, 1995, P.L. 4, No. 2, 35 P.S. §§ 6026.101-.908.

26

[A]n appropriate number of sample locations should be investigated from the identified media of concern to characterize the nature and composition of the contaminants including:

   (1) Source characterization or development of a conceptual site model.

   (2) The vertical and horizontal extent of contamination above the selected standard within each medium of concern.

   (3) The direction and rate of contaminant movement within each medium of concern.

   (4) Identification of the appropriate remedial technology options for each medium of concern.

25 Pa. Code § 250.408(b). CERCLA and its accompanying regulations provide, likewise, that the purpose of an RI is to "collect data necessary to adequately characterize the site for the purpose of developing and evaluating effective remedial alternatives," and the "primary objective" of an FS is to "ensure that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected." 40 C.F.R. § 300.430(d)(1), (e)(1).

In view of the policy language, the amended consent order, and the EPA and DEP regulations, an RI is primarily an information gathering process to determine the scope and extent of contamination. This is the type of investigation an insurer would be expected to engage in under its duty to defend for purposes of determining the risk of loss and "mitigat[ing] future indemnification responsibilities." *Jerry's Sport Ctr.*, 948 A.2d at 848. On the other hand, the purpose of an FS is to develop and evaluate remedial actions for purposes of repairing or restoring the land to its original condition, the implementation of which will carry a cost recoverable under Pennsylvania law as an item of "damages." *Kirkbride*, 560 A.2d at 812.

Accordingly, we presume that to the extent an expense is primarily attributable to an RI, which addresses the sources, scope, and extent of the

27

contamination, it is a defense cost. The burden should be on the insurer, or any party disadvantaged by the presumption, to show that the insured has derived an unjust benefit from such an allocation to the extent that the insurer has incurred an expense that would have been covered as damages for indemnification and subject to policy limit under the insurance policy. Likewise, we presume that to the extent that an expense is primarily attributable to an FS, which comprises plans for selecting and implementing the remediation alternatives for the site, it is an indemnity cost. The burden should be on the insured, or any party disadvantaged by the presumption, to show that the insurer has derived an unjust benefit from such an allocation to the extent that it has relieved the insurer of an expense that it would otherwise have incurred under its obligation to defend.

This approach points us toward our goal of fulfilling the fair expectations of the parties to the insurance contract. While insureds and insurers generally expect that a careful investigation of the insured's potential liability will be provided by the insurer pursuant to its duty to defend, it is unlikely that the insured could fairly expect that the insurer would bear limitless liability to perform RI and FS associated with government-mandated environmental cleanups. As the New Jersey Supreme Court pointed out in *Fairclough*, the issue of characterizing RI and FS costs incurred in the context of CERCLA is "legally and scientifically complex," and courts must attempt to provide a cost-efficient method of resolving disputes that are not plainly controlled by policy language. *Fairclough*, 672 A.2d at 1163. We believe that under Pennsylvania law, a balanced solution that allocates the costs between defense and indemnity, rebuttable by the party disadvantaged by the presumption, is appropriate.

For all of these reasons, we deny PMA's application for summary relief to the extent it seeks a ruling that the RI and FS costs incurred by Johnson Matthey for the

28

Site under DEP's August 4, 2009 amended consent order must be characterized as indemnity costs.

### III. JOHNSON MATTHEY'S APPLICATION FOR PARTIAL SUMMARY RELIEF

### A. Summary of Arguments

Johnson Matthey seeks summary relief on its claims that PMA has breached its duty to defend by failing to pay in full Johnson Matthey's counsel fees from May 31, 2015 forward. Specifically, Johnson Matthey's application for partial summary relief demands that PMA (1) reimburse Johnson Matthey for all of the legal fees it paid to Saul Ewing with respect to the "Bishop Tube Claim" during the June 2015 to December 2018 period; (2) pay Saul Ewing's bills for its work from January 2019 forward, in full and without deductions; and (3) pay Johnson Matthey's defense costs going forward at the rates billed by Saul Ewing and without reductions. (Johnson Matthey Application for Partial Summary Relief ¶¶14, 15.) The "Bishop Tube Claim," Johnson Matthey avers, is its "alleged liability for environmental property damage relating to" the Site, which includes, "without limitation," the Underlying Action. (*Id*. ¶1.) Johnson Matthey argues that under *Gedeon v. State Farm Mutual Automobile Insurance Company*, 188 A.2d 320, 322 (Pa. 1963), "recovery for breach of the covenant to defend will ordinarily be the cost of hiring substitute counsel and other costs of the defense."

Johnson Matthey's application includes affidavits and correspondence between PMA and Johnson Matthey, which show, *inter alia*, that PMA agreed to retain Saul Ewing to defend Johnson Matthey in the Underlying Action on February 7, 2011, and Saul Ewing agreed to comply with PMA's liability litigation management guidelines for defense counsel (Litigation Guidelines). (Johnson Matthey Application, John M. Hagan Affidavit, Ex. 1.) PMA had paid Saul Ewing

29

at the negotiated, reduced, hourly rates until May 31, 2015, when PMA withdrew from the defense of the Underlying Action, and PMA owes Johnson Matthey $570,715.79 for legal work that Saul Ewing did from June 2015 through December 2018.[15]  (Johnson Matthey Application, Amy Donohue-Babiak Affidavit ¶5.)  The Underlying Action was placed on a suspended docket in March 2009, while "certain aspects of the remedial investigation" at the Site were performed.  (Johnson Matthey Application, Cathleen M. Devlin Affidavit ¶4.) The Underlying Action was returned to the active docket in June 2017, and discovery in the Underlying Action closed on December 31, 2018.  (*Id*. ¶¶4-5.)

Saul Ewing offered a 10% discount on its standard hourly rates and is owed $90,083.40 for work performed with respect to the Underlying Action from January 1, 2019, through August 31, 2019.  (*Id*. ¶¶7-8.)  Johnson Matthey acknowledged that PMA has paid "certain Saul Ewing invoices," *i.e.*, for work done between January and April of 2019.  (Johnson Matthey Application ¶10.)  In its brief, Johnson Matthey denies that either it or Saul Ewing agreed to the Litigation Guidelines or even received them.  (Johnson Matthey Brief at 10.)  It argues that PMA has applied the Guidelines "retroactively and unilaterally" in order to obtain "further reductions of Saul Ewing's invoices."  (*Id.*)

In response, PMA contends that Saul Ewing was retained to defend the Underlying Action, not the "Bishop Tube Claim" as broadly defined by Johnson Matthey.  PMA asserts that it is not required to pay "any and all invoices and submittals made by defense counsel"; rather, it has in the past and will in the future

---

[15] Johnson Matthey avers that it paid Saul Ewing a total of $1,089,570.56 for work performed from June 2015 through December 2018, for which PMA has only reimbursed $518,854.77.

pay for all "reasonable defense costs and fees incurred by Saul Ewing." (PMA Brief at 1, 10.)

PMA avers that on September 25, 2018, it advised Johnson Matthey that it would pay all reasonable defense costs and fees incurred by the latter in the defense of the Underlying Action for the period of May 31, 2015, through June 30, 2018, and that PMA would continue to defend Johnson Matthey in the Underlying Action. (PMA Answer in Opposition to Johnson Matthey's Application for Partial Summary Relief, Ex. B, Sallyanne Donovan Affidavit ¶11.) All payments would be made "subject to Saul Ewing's then[-]standard attorney billing rates and [Litigation] Guidelines." (*Id.*)

PMA maintains that it is not responsible for the following fees and costs submitted by Johnson Matthey for the period of May 31, 2015, through June 30, 2019:

- Fees and costs incurred prior to June 2017, when the Underlying [Action] was in "civil suspense" and therefore inactive.
- Fees billed by Saul Ewing for work related to insurance coverage issue and not the Underlying [Action].
- Fees and costs for non-professional services and other un-reimbursable charges as set forth in the [Litigation] Guidelines.

(PMA Answer, Ex. B, Sallyanne Donovan Affidavit ¶12.) PMA identifies the following fees and costs included in Saul Ewing's invoices as for "non-professional services" or "un-reimbursable charges":

- Work entries that are block billed with no separate outlined billing times for each task performed;
- Costs for which no receipts have been submitted;
- Duplicative attendance at depositions;
- Interoffice conferences between Saul Ewing lawyers and/or staff;

31

- Vague time entries that list a task but do not identify whatsoever the purpose of the task/work.

(PMA Answer, Ex. B, Sallyanne Donovan Affidavit ¶18.) PMA further avers that Johnson Matthey has not submitted, and PMA has not reviewed, Saul Ewing's invoices for the period of July 1, 2018, to December 31, 2018. (PMA Answer, Ex. B, Sallyanne Donovan Affidavit ¶20.)

## B. Analysis

PMA agreed to defend "any suit against [Johnson Matthey] seeking damages on account of . . . bodily injury or property damage." (PMA Amended Petition for Review ¶16, Ex. C at 2, § I.) A refusal to defend constitutes a breach of contract, and damages for the breach are based upon "the usual contract rule." *Gedeon*, 188 A.2d at 322. This rule allows an award of damages "which will place the injured party in the position which he would have been in had the obligation in question been performed." *Id.* at n.5 (citing Restatement (First) of Contracts § 329(a) (Am. Law Inst. 1932)). As such, "the recovery for breach of the covenant to defend will ordinarily be the cost of hiring substitute counsel and other costs of the defense." *Id.* at 322.

While it is true that damages are owed to the insured in the amount that returns the parties to the position they would have been in but for the breach, the insured is not expected or required to hire substitute counsel under the same terms as the insurer would have but for the breach. We, thus, reject PMA's assertion that Johnson Matthey and Saul Ewing were bound by the Litigation Guidelines after May 31, 2015, when PMA breached its contractual obligation to defend. Conversely, if PMA resumed its duty to defend, as it alleges, on September 25, 2018, PMA is not prohibited from negotiating a substitute fee arrangement with

Saul Ewing or even obtaining substitute counsel, so long as Johnson Matthey is not prejudiced.

We also reject Johnson Matthey's argument that PMA is required to pay *all* Saul Ewing invoices from May 31, 2015, through the present. To hold otherwise would deviate from the well-established contract rule that a party that suffers damages as a result of breach of contract is bound to use ordinary care and diligence to lessen damages as far as is practicable. *Henry Shenk Co. v. Erie Cty.*, 178 A. 662, 666 (Pa. 1935) (observing "a party cannot recover damages from a defaulting defendant which could have been avoided by the exercise of reasonable care and effort," and this rule is applicable to "all types of contracts"). While the recovery for breach of the duty to defend will "ordinarily be the cost of hiring substitute counsel and other costs of the defense," *Gedeon*, 188 A.2d at 322, our Supreme Court has also illustrated:

> Damages for which compensation may be justly claimed and allowed are such only as naturally and ordinarily flow from the breach of contract complained of. They should be such as may fairly be supposed to have entered into the contemplation of the parties when they made the contract, or such as might according to the ordinary course of things be expected to follow its violation.

*Macchia v. Megow*, 50 A.2d 314 (Pa. 1947); *see also Birth Ctr. v. St. Paul Cos., Inc.*, 787 A.2d 376, 390 (Pa. 2001) (holding that where insurer's refusal to settle claim constituted breach of its contractual duty to act in good faith and its fiduciary duty to its insured, insurer is liable for "*known and/or foreseeable compensatory damages of its insured that reasonably flow from the insurer's bad faith conduct*" (emphasis added)).

After viewing the record in the light most favorable to PMA, the nonmoving party, we conclude that there are disputed material issues of fact that relate to

33

Johnson Matthey's counterclaims. *Summer Sch., Inc.*, 108 A.3d at 196. While we agree that PMA breached its duty to defend by withdrawing from the defense of the Underlying Action on May 31, 2015, the record is unclear whether Johnson Matthey's claimed damages, namely, $570,715.79 for Saul Ewing's work performed from June 2015 through December 2018, and $90,083.40 from January 2019 through August 2019, were all caused by PMA's breach on May 31, 2015. The Underlying Action was placed on a suspended docket in March 2009 and was not returned to the active docket until June 2017, and certain invoices submitted by Saul Ewing, according to PMA, were unrelated to the Underlying Action. (PMA Answer, Ex. B, Sallyanne Donovan Affidavit ¶12.) Stated otherwise, the record is unclear whether all of Saul Ewing's invoices were "costs of the defense" incurred to either avoid or limit liability under CERCLA and HSCA. *Gedeon*, 188 A.2d at 322. Further, it may be that PMA has resumed its duty to defend since September 25, 2018, and, if so, it should be allowed to attempt to renegotiate the fee arrangement with Saul Ewing or even obtain substitute counsel, so long as no prejudice falls on Johnson Matthey.

For all these reasons, we deny Johnson Matthey's application for partial summary relief that demands PMA pay in full Johnson Matthey's counsel fees from May 31, 2015, forward.

## IV. CONCLUSION

For the reasons set forth above, we deny PMA's application for partial summary relief. In doing so, we hold that PMA's duty to defend was triggered on May 24, 2006, when DEP notified Johnson Matthey that it had been identified as a PRP with respect to environmental contamination at the Site. We also hold that the costs incurred by Johnson Matthey through Roux under DEP's amended consent order must be allocated between defense costs and indemnity costs (damages).

34

Expenses primarily attributable to RI are presumed to be defense costs. The insurer or any party disadvantaged by the presumption carries the burden to show that the insured has derived an unjust benefit from such an allocation. Expenses primarily attributable to an FS are presumed to be indemnity costs. The burden is on the insured, or any party disadvantaged by the presumption, to show that the insurer has derived an unjust benefit from the allocation. Finally, we deny Johnson Matthey's application for partial summary relief because issues of material fact remain in dispute.

P. KEVIN BROBSON, Judge

President Judge Leavitt and Judge Fizzano Cannon did not participate in the decision of this case.

35

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Manufacturers'   :
Association Insurance Company,   :
               Petitioner   :
  :
          v.   :   No. 330 M.D. 2015
  :
Johnson Matthey, Inc. and   :
Pennsylvania Department of   :
Environmental Protection,   :
            Respondents   :
  :
Johnson Matthey, Inc.,   :
Third-Party Petitioner   :
  :
          v.   :
  :
Continental Casualty Company,   :
American Casualty Company   :
of Reading, PA, and   :
Federal Insurance Company,   :
Third-Party Respondents   :

# **O R D E R**

AND NOW, this 19th day of November, 2020, Pennsylvania Manufacturers' Association Insurance Company's (PMA) and Johnson Matthey, Inc.'s cross-applications for partial summary relief are DENIED.

Pursuant to 42 Pa. C.S. § 702(b), it is the Court's opinion that the portion of this Order denying PMA's cross-application for partial summary relief, relating to the appropriate characterization and allocation of remedial investigation and feasibility study expenses as between defense costs and indemnity (damages) costs under a commercial insurance policy, involves a controlling question of law as to

which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the matter.

_____
P. KEVIN BROBSON, Judge